KARIN G. PAGNANELLI (SBN 174763), kgp@msk.com
MARC E. MAYER (SBN 190969), mem@msk.com
EMILY F. EVITT (SBN 261491), efe@msk.com
DANIEL A. KOHLER (SBN 285501), dxk@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone:   (310) 312-2000
Facsimile:    (310) 312-3100

Attorneys for Plaintiffs Blizzard
Entertainment, Inc. and Valve Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| Blizzard Entertainment, Inc., and Valve Corporation,<br><br>　　　　　　Plaintiffs,<br><br>　　　v.<br><br>Lilith Games (Shanghai) Co. Ltd., uCool, Inc., and uCool Ltd.,<br><br>　　　　　　Defendants. | CASE NO. 3:15-cv-04084-CRB-JSC<br><br>The Honorable Charles R. Breyer<br><br>**MEMORANDUM OF PLAINTIFF VALVE CORPORATION IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT RE OWNERSHIP OF DOTA**<br><br>**[DECLARATIONS OF "ICEFROG," KYLE SOMMER, MARC DEFOREST, AND MARC MAYER IN SUPPORT]**<br><br>Date:　　　March 10, 2017<br>Time:　　　10:00 a.m.<br>Ctrm.:　　　6, 17th Floor |

**REDACTED VERSION OF DOCUMENT**

**SOUGHT TO BE FILED UNDER SEAL**

Mitchell
Silberberg &
Knupp LLP

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF ARGUMENT. .........................................................................1

II.     ISSUE PRESENTED. ......................................................................................2

III.    STATEMENT OF FACTS. ...............................................................................2

IV.     THE LEGAL STANDARD. ............................................................................10

V.      THE FACTUAL RECORD IS SUFFICIENT FOR A JURY TO REASONABLY
        CONCLUDE THAT VALVE IS AN OWNER OR CO-OWNER OF DOTA.................11

        A.      Eul, Guinsoo, And Icefrog Are Joint Authors Of DotA........................11

        B.      Individuals Who Purportedly Suggested Ideas For Certain DotA Heroes Are
                Not Owners Of Those Discrete DotA Heroes. ......................................15

                1.      Copyright Does Not Subsist In Individual Contributions To An
                        Integrated Audiovisual Work Such As DotA............................16

                2.      DotA Is Not A "Collective Work" And Hero *Ideas* Are Not Works Of
                        Authorship. ..............................................................18

VI.     EUL DID NOT ABANDON HIS COPYRIGHT. .........................................21

VII.    ICEFROG DID NOT ASSIGN HIS RIGHTS IN DOTA TO A THIRD PARTY. ..........24

VIII.   BLIZZARD'S CLAIMS ARE NOT AT ISSUE IN THIS MOTION..............................24

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

### CASES

*16 Casa Duse LLC v. Merkin*,
   791 F.3d 247 (2d Cir. 2015) .................................................................................16, 18

*A&M Records v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ........................................................................................21

*Aalmuhammed v. Lee*,
   202 F.3d 1227 (9th Cir. 2000) ................................................................................ *passim*

*Ahanchian v. Xenon Pictures, Inc.*,
   403 Fed. Appx. 166 (9th Cir. 2010) ...............................................................................10

*Broderbund Software, Inc. v. Unison World, Inc.*,
   648 F. Supp. 1127 (N.D. Cal. 1986) ...............................................................................11

*Burrow-Giles Lithographic Co. v. Sarony*,
   111 U.S. 53 (1884) ...........................................................................................................12

*Cavalier v. Random House, Inc.*
   297 F.3d 815 (9th Cir. 2002) ...........................................................................................21

*Cohen v. Trump*,
   2014 U.S. Dist. LEXIS 23885 (S.D. Cal. Feb. 21, 2014) ...............................................25

*Community for Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989) .........................................................................................................12

*Complex Sys. v. ABN AMBRO Bank N.V.*,
   979 F. Supp. 2d 456 (S.D.N.Y. 2013) .............................................................................10

*Corbello v. Devito*,
   777 F.3d 1058 (9th Cir. 2015) .........................................................................................15

*Credit Bureau Connection, Inc. v. Pardini*,
   726 F. Supp. 2d 1107 (E.D. Cal. 2010) ...........................................................................20

*Davis v. Blige*,
   505 F.3d 90 (2d Cir. 2007) ................................................................................................8

*Direct Techs., LLC v. Elec. Arts, Inc.*,
   836 F.3d 1059 (9th Cir. 2016) .........................................................................................10

*Donen v. Paramount Pictures Corp.*,
   89 U.S.P.Q.2d 1470 (C.D. Cal. 2008) .............................................................................17

Mitchell
Silberberg &
Knupp LLP

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*Donna v. Dodd, Mead & Co.*,
 374 F. Supp. 429 (S.D.N.Y.1974) ..........................................................................14

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*,
 140 F.2d 266 (2d Cir. 1944) ................................................................................15

*Ets-Hokin v. Skyy Spirits, Inc.*,
 225 F.3d 1068 (9th Cir. 2000) .............................................................................21

*Garcia v. Google*,
 786 F.3d 753 (9th Cir. 2015)........................................................................16, 18

*Hadady Corp. v. Dean Witter Reynolds, Inc.*,
 739 F. Supp. 1392 (C.D. Cal. 1990)......................................................................23

*Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*,
 789 F. Supp. 2d 242 (D. Mass. 2011) ...................................................................10

*Infodek, Inc. v. Meredith-Webb Printing Co.*,
 830 F. Supp. 614 (N.D. Ga. 1993) ..........................................................................8

*Intimo, Inc. v. Briefly Stated, Inc.*,
 948 F. Supp. 315 (S.D.N.Y. 1996)...........................................................................8

*Jacobsen v. Katzer*,
 535 F.3d 1373 (Fed. Cir. 2008) .............................................................................22

*Jarvis v. K2 Inc.*,
 486 F.3d 526 (9th Cir. 2007)..................................................................................17

*Lam v. City & County of San Francisco*,
 2011 U.S. Dist. LEXIS 135538 (N.D. Cal. Nov. 22, 2011) .........................................4

*Lilith Games (Shanghai) Co. Ltd. v. uCool, Inc. et al.*,
 Case No. 3:15-cv-01267-SC ...........................................................................9, 22

*Lindsay v. R.M.S. Titanic*,
 52 U.S.P.Q.2d 1609 (S.D.N.Y. 1999) ....................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) .............................................................................................10

*Melchizedek v. Holt*,
 792 F. Supp. 2d 1042 (D. Ariz. 2011) ...................................................................23

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.,*
  900 F. Supp. 1287 (C.D. Cal. 1995)..................................................................17, 21

*Micro Star v. Formgen Inc.,*
  154 F. 3d 1107 (9th Cir. 1998)..............................................................3, 4, 12, 22

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*
  795 F.3d 997 (9th Cir. 2015)...........................................................................8

*Morrill v. Smashing Pumpkins,*
  157 F. Supp. 2d 1120 (C.D. Cal. 2001)..............................................................15

*Oracle Corp. v. SAP AG,*
  734 F. Supp. 2d 956 (N.D. Cal. 2010) ..............................................................8

*Paramount Pictures Corp. v. Carol Publ'g Group,*
  11 F. Supp. 2d 329 (S.D.N.Y. 1998)..................................................................22

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*
  531 F.3d 962 (9th Cir. 2008)...........................................................................17

*Seiler v. Lucasfilm, Ltd.,*
  808 F.2d 1316 (9th Cir. 1986).........................................................................19

*Seshadri v. Kasraian,*
  130 F.3d 798 (7th Cir. 1997)...........................................................................14

*Shapiro v. Jerry Vogel Music Co.,*
  221 F.2d 569 (2d Cir. 1955)...........................................................................14

*Siegel v. Time Warner Inc.,*
  496 F. Supp. 2d 1111 (C.D. Cal. 2007)..............................................................15

*TMTV, Corp. v. Mass Prods., Inc.,*
  345 F. Supp. 2d 196 (D.P.R. 2004) ..................................................................20

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC,*
  692 F.3d 1009 (9th Cir. 2012)...........................................................................10

*Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,*
  609 F. Supp. 1307 (E.D. Pa. 1985) ..............................................................13, 20

*Wyatt Tech v. Malvern Instruments Inc.,*
  2009 U.S. Dist. LEXIS 66097 (C.D. Cal. July 29, 2009) ........................................23

Mitchell
Silberberg &
Knupp LLP

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Zendel v. Circle Location Servs., Inc.*,
    2012 WL 12876540 (C.D. Cal. Feb. 2, 2012) ......................................................................25

*Zuill v. Shanahan*,
    80 F.3d 1366 (9th Cir. 1996) ............................................................................................10

**STATUTES**

17 U.S.C.
    § 101 .........................................................................................................................11, 14, 18
    § 102 ................................................................................................................................11, 19
    § 201 ......................................................................................................................................15
    § 410(c) .................................................................................................................................11

Fed. R. Evid.
    Rule 1002 ..............................................................................................................................19

**OTHER AUTHORITIES**

http://blog.dota2.com ...................................................................................................................2

Mitchell
Silberberg &
Knupp LLP

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# I.      SUMMARY OF ARGUMENT.

Collectively, Plaintiffs Blizzard Entertainment, Inc., and Valve Corporation own the computer games Warcraft III, DotA and Dota 2 (DotA stands for "Defense of the Ancients"). These are hugely popular, complex, competitive multiplayer games that take place in imaginary fantasy worlds and feature a variety of heroes and monsters, battlefields, ancillary characters and animations, and a vast array of weapons and related items that can be equipped and used by players.  Plaintiffs and their predecessors-in-interest have developed, maintained, and distributed each of these games over a period of more than 15 years.  In 2014, Defendant uCool, Inc. ("uCool") began selling a lucrative mobile game titled "Heroes Charge" – which is itself a copy of Defendant Lilith's game titled "DotA Legends."   Heroes Charge (and DotA Legends) feature, among other infringing elements, dozens of Dota 2 and DotA heroes and extensive artwork, imagery, and music from Warcraft III and its spin-off game "World of Warcraft."  In short, uCool appropriated substantial aspects of Warcraft III, DotA and Dota 2 into an unauthorized mobile application.

By its Motion for Partial Summary Judgment, uCool attempts to create a diversion by attacking Plaintiffs' underlying rights in their computer games.  Specifically, by this motion, uCool challenges Valve's ownership of DotA.  It does so by ignoring uncontroverted evidence surrounding the development of the game, mischaracterizing the evidence relating to the role of DotA's developers, and attempting to recast the computer game as a "collection" of individually copyrighted pieces.  Then, uCool argues that because various individuals purportedly offered ideas for a handful of DotA heroes along the way, these various individuals (and not the developers of the game) own the heroes that were inspired by their ideas.   But uCool's motion relies on a fundamental mischaracterization of Plaintiffs' claims and of the Copyright Act.  The copyrighted works of authorship at issue in this lawsuit are *games*, not individual pieces of those works. DotA, like any other computer game, is a complete audiovisual work whose various elements and components comprise a single work of authorship.  The authors of this work were Plaintiffs' predecessors, the game developers who masterminded DotA's creation.  uCool's arguments to the contrary fly in the face of the basic and well-settled principles that *ideas* are not protected by

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

1   copyright, and that an individual cannot claim separate copyright ownership of his or her discrete

2   contribution of ideas or concepts to a greater artistic work.  For this reason, courts have

3   consistently rejected arguments like uCool's, refusing to allow litigants to poke holes in ownership

4   rights and make "Swiss cheese" of copyrights.  uCool's attack on Valve's ownership is

5   particularly audacious given that uCool itself does not claim to own DotA, but rather relies on

6   hypothetical copyright claims of third parties, some of which have been expressly disclaimed by

7   those third parties, and further are unsubstantiated by evidence in this record.

8   　　　　uCool's remaining arguments are equally without merit.  Contrary to uCool's claims, the

9   evidence is that DotA's first author, Eul, did not intend to abandon his rights; at best, this is an

10   issue of fact that must be decided by a jury.  As for uCool's claim that DotA's third author,

11   Icefrog, assigned his rights to a third party, that is flatly inconsistent with the evidence.  Finally,

12   uCool cannot shoehorn Blizzard's claims into this Motion (filed only against Valve), including by

13   invoking the doctrine of "claim splitting," which has no relevance here.  Thus, even putting aside

14   the numerous factual disputes concerning uCool's arguments, uCool's motion fails as a matter of

15   law.  uCool's motion should be denied.

16   **II.     ISSUE PRESENTED.**

17   　　　　Does Valve, as the owner of Dota 2 and co-owner of DotA, have standing to assert its

18   claims for infringement of its copyrights in Dota 2 and DotA against Defendants?

19   **III.    STATEMENT OF FACTS.**

20   　　　　**Dota 2.**  Valve is the developer, publisher and registered copyright owner of Dota 2.  FAC,

21   ¶ 27.  Dota 2 was released to the public by Valve in 2013 and was developed (and continues to be

22   developed) by a team of dozens of programmers, artists, game designers, and composers over a

23   period of several years.  Declaration of ███████ a/k/a "Icefrog" ("Icefrog Decl."), ¶ 32.  Dota

24   2 is a team-based multiplayer game in which players select a unique "hero" from a roster of over

25   100 playable characters and play as that hero as part of an online team.  *Id.*  During the game, the

26   player's hero grows stronger, acquires new spells and abilities, and obtains gold to buy new items

27   such as potions, armor, weapons, and useful trinkets.  Dota 2 is enormously popular and is played

28   by more than 13 million players each month.  *See* http://blog.dota2.com.  Dota 2 is the successor

Mitchell
Silberberg &
Knupp LLP

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   to DotA, which, in turn, is a derivative work of "Warcraft III." Icefrog Decl., ¶ 33. Dota 2 was

2   independently created by Valve and is not a "modification" of Warcraft III. *Id.*,¶ 34.

3   **Blizzard and Warcraft III.** Blizzard's Warcraft III is a computer strategy game where

4   players control various military "units" (such as soldiers, scouts, and "heroes"), build armies, and

5   engage in large-scale battles against opponents on a computer-generated playing field.

6   Declaration of Kyle Sommer a/k/a "Eul" ("Sommer Decl."), ¶ 2. One of the innovations that

7   Warcraft III brought to its genre was the introduction of "hero" units: special units with a name,

8   distinct characteristics, and the ability to gain new spells, skills, and other abilities. Declaration of

9   Sommer Decl., ¶ 3; Icefrog Decl., ¶ 5. (For example, a hero might start the game with the ability

10  to shoot a single arrow and later gain the ability to fire three arrows at once.)

11  Warcraft III comes with a software tool called the "World Editor," which enables Warcraft

12  III users to use its underlying software and components (i.e., "assets") to create custom items,

13  maps, units, sounds, artwork, and environments. Sommer Decl., ¶ 4; Icefrog Decl., ¶ 6. Using the

14  World Editor, a player also can design units that act differently than they do in Warcraft III,

15  change the way the game looks, change the rules and layout, and modify the strength or abilities of

16  individual player units. *Id.* As such, a modder can design a new game with new gameplay within

17  the Warcraft III environment. *Id.* The works created using the World Editor are known as "mods"

18  (i.e., "modifications") or "maps." *Id.*

19  Once a game designer has created a Warcraft III mod, he or she can save it as a computer

20  file that can be distributed to other players from within Warcraft III, by email, or by digital

21  download from a website. Sommer Decl., ¶ 5. A Warcraft III mod cannot be played on its own

22  and without a copy of Blizzard's Warcraft III game software. *Id.*, ¶ 6. Rather, the mod contains

23  computer code or instructions that tell the Warcraft III game "engine" (i.e., the underlying

24  software code that makes the game operate) how to use in-game objects or artwork (i.e., game

25  "assets") and how to run the game. *See Micro Star v. Formgen Inc.*, 154 F. 3d 1107, 1110 (9th

26  Cir. 1998) (explaining computer game mods). While a Warcraft III mod necessarily uses the

27  Warcraft III game engine, sophisticated developers can create mods that add new characters,

28  change win conditions, cause units to act in new ways, change the objective of the game or the

Mitchell
Silberberg &
Knupp LLP

1    way it plays, add new or customized animations, and make countless other changes.  Moss Depo.,

2    at 34:18-38:16[1]; Sommer Decl., ¶ 4.  Warcraft III mods (including DotA) are derivative works of

3    Warcraft III.  *Micro Star*, 154 F.3d at 1113.

4        **The Development of DotA.**  "Defense of the Ancients," or "DotA," is a Warcraft III mod

5    that has been played by millions of people.  DotA was created over a period of approximately 12

6    years by three primary game developers:  Kyle Sommer (a/k/a "Eul"), Stephen Feak (a/k/a

7    "Guinsoo"), and ██████████ (a/k/a "Icefrog") (collectively, the "DotA Authors").  The DotA

8    Authors, along with Blizzard (which provided Warcraft III and all of the tools to make DotA),

9    were responsible for creating and building DotA into the game that exists today (and from which

10    Dota 2, in turn, was in part derived).

11        ***Eul.***  In late 2002, Kyle Sommer (a/k/a "Eul"), then a sixteen-year-old high school student,

12    used the World Editor to create a Warcraft III mod where players assume the role of unique heroes

13    and compete online against opposing players in a team in an effort to destroy the opponent's base.

14    He titled his game "Defense of the Ancients," or "DotA."  Sommer Decl., ¶¶ 7, 8.  Eul did all of

15    his work on DotA on his own time, with his own money, on his own computer, and without any

16    direct input from anyone.  Sommer Depo., 46:8-50:7; 53:14-23; 60:12-61:16; 62:23-63:5; Sommer

17    Decl., ¶¶ 7-8, 14.

18        To develop DotA, Eul created and designed a roster of playable heroes with unique names,

19    skills and abilities.  Sommer Decl., ¶ 10.  Eul programmed each hero with a set of skills, spells,

20    and abilities to give it an original playstyle and personality.  *Id.*, ¶ 10.  Eul's initial DotA maps

21    contained 20 heroes,[2] all but one of which was designed and coded by Eul (the one exception, Pit

22    Lord, was brought in directly from Warcraft III).  Sommer Depo., 34:21-35:8; Sommer Decl., ¶

23    10.  Throughout 2003, Eul continued to update DotA, incorporating many improvements, adding

24

25    ──────────────────

      [1] Excerpts of the deposition transcripts are attached as Exhibits 1 through 7 to the Declaration of
      Marc E. Mayer, filed concurrently herewith.

26

27    [2]  uCool has attempted to twist the facts by claiming that in his deposition Eul did not remember
      creating some of the content featured in his early DotA versions.  However, a deposition is not a
      "memory test," *Lam v. City & County of San Francisco*, 2011 U.S. Dist. LEXIS 135538, at *2-3
      (N.D. Cal. Nov. 22, 2011), and Eul testified that all of the content contained in his versions of
      DotA (including the heroes) was created by him.  Sommer Depo., 34:21-35:8.

28

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

(or subtracting) new items and heroes (or reworking versions of existing heroes), and improving animations and skills.  Sommer Depo., 61:19-62:12; Sommer Decl., ¶ 11.  By late 2003, DotA contained 32 heroes and was substantially improved.  Sommer Decl, ¶ 11.

In 2004, Eul, while working on a large update to the game, decided that due to other time commitments he could not continue working on the game and could not finish his update.  Sommer Decl., ¶ 15.  Thus, he told the DotA online player community that his mod was "open source" and other DotA fans were free to work on DotA and release new updates.  *Id.*, ¶ 15-19.  As set forth below (at Section VI, pp. 21-23), Eul did not intend to abandon his rights to his game, especially any rights he might have had to control the commercial use and exploitation of his original expression and prevent infringing stand-alone games (such as copycat mobile titles).  *Id.*, ¶ 15-19.

***Guinsoo***.  Sometime in late 2003, Steve Feak (a/k/a "Guinsoo") became lead developer of a version of DotA then known as "DotA Allstars."  Feak Depo., 196:18-22, 197:13-198:8.  When Guinsoo became lead developer, the game contained approximately 30 heroes.  *Id.*, 214:9-16.  For the next year or so, Guinsoo made major modifications and substantive improvements to the game.  *Id.*, 207:1-209:20.  During this time Guinsoo, with some limited assistance from a small team of friends and "beta testers," developed and released more than 100 updates to DotA.  *Id.*, 235:11-15; Mescon Depo., 144:13-146:25.

During the time that Guinsoo was lead developer of the game, he completely overhauled it.  Guinsoo created and built an enormous body of new content into the game, such as new heroes, weapons, and gameplay mechanics.  Feak Depo., 211:4-213:5.  He created and added nearly 40 heroes, created and added dozens of items and weapons to the game, and made major stabilization and gameplay improvements and changes.  *Id.*, 215:4-17; 223:18-225:12.  Guinsoo made substantial changes to most or all of the existing heroes present in the game at the time (including by changing skills and generally reworking the way these characters played).  He also almost completely rewrote DotA's code.  *Id*., 229:25-230:18; 235:11-236:15.  Guinsoo spent well over 2,000 hours working on the game.  *Id.*, 232:23-233:10.  By the time Guinsoo stopped working on the game, there were at least 69 heroes in the game, most of which were brand new, and others

Mitchell
Silberberg &
Knupp LLP

5                    CASE NO. 3:15-cv-04084-CRB

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   heavily reworked or reimagined from earlier versions.  *Id*., 214:9-215:17.

2          While he was lead developer, Guinsoo exercised complete control over the game.  Baker

3   Depo., 87:18-88:2.  To ensure that no one else could work on or modify the game, Guinsoo

4   "locked" the code using encryption software.  Guinsoo was the only person with access to the

5   "unlocked" or unencrypted file.  Feak Depo., 32:14-21; 198:19-25; 199:19-200:2; Moss Depo.,

6   52:11-54:9.  Additionally, while Guinsoo received some ideas and suggestions for the game from

7   his team or from the game's online fans (who referred to themselves as the "community"),

8   Guinsoo exercised absolute discretion as to which of those ideas or suggestions he would take into

9   consideration or include in the next update or version of the game.  Feak Depo., 197:23-198:18;

10  216:14-20; Moss Depo., 45:22-47:13.  Guinsoo had a unified vision for the game, and all of the

11  work that he did (or that members of his team did for him) was in furtherance of that broader goal

12  and vision.  Feak Depo, 203:2-12; 210:14-211:13; 236:9-24.

13         ***Icefrog***.  Guinsoo continued to work on DotA until early 2005, but ultimately also could

14  not get it to the quality "we were trying to head toward" (Feak Depo., 236:9-15), and he did not

15  complete a major planned update that he was working on.  Icefrog Decl., ¶ 12.  Thus, in early

16  2005, Guinsoo turned his work-in-progress over to one of his helpers, Alex Moss (a/k/a

17  "Neichus") and Icefrog.  Feak Depo., 12:21-13:8; Mayer Decl., Ex. 10 (email); Icefrog Decl., ¶

18  12-13.  Guinsoo expected and intended that Neichus and/or Icefrog would continue to update the

19  game, improve it, and finish the project.  Icefrog Decl., ¶ 13.  In early 2005, Icefrog and Neichus,

20  with Guinsoo's "blessing," (Icefrog Depo. 248:7-20; Feak Depo. 12:21-13:8) released a series of

21  updates to DotA that made a large number of changes to the game, including adding several new

22  heroes and items, improving the loading time, and fixing a number of bugs.  Icefrog Decl., ¶ 14.

23  Shortly thereafter, Neichus departed from the game and Icefrog became the sole lead developer.

24  Icefrog Depo. 26:4-28:6; Moss Depo., 99:14-100:14.

25         From 2005 to 2015, Icefrog spent thousands of hours working on DotA and released over

26  83 updates to the game.  Icefrog Depo. 24:22-25:21; 62:18-63:3.  During these 10 years, Icefrog

27  made huge changes to DotA.  He re-wrote major parts of the game, added numerous items, deleted

28  some items, changed the way many items work, and fixed memory leaks and bugs.  Icefrog Decl.,

Mitchell
Silberberg &
Knupp LLP

¶¶ 20-21.  Icefrog also created, built and implemented several new game heroes, re-implemented or re-imagined heroes that had existed in earlier versions of DotA, and made massive changes to existing heroes.  *Id.*  Every single hero in the game received a number of changes, including changes to their skills and to the way those skills operate or are animated in the game.  Not one DotA hero was left unchanged.  *Id.*  These changes included replacing abilities with new ones, reworking existing abilities, altering the power or strength of certain abilities, changing the range or area of effect of an ability, changing the "cooldown" of an ability (i.e., the amount of time until it can be used again), changing the visual appearance of an ability or its animation, and changing the movement speed of a character.  *Id.*  Icefrog also worked to ensure that each DotA hero had a useful place in the game, that no hero was too strong or too weak, and that each of the heroes complemented each another.  *Id.*, ¶ 19.

Like Eul and Guinsoo, during the time that Icefrog was developing DotA, he exercised complete control over the game and its contents.  Mescon Depo., 67:11-15; Icefrog Decl., ¶ 17.  Like Eul and Guinsoo, Icefrog kept DotA locked and did not permit anyone to make changes to the game.  Icefrog Decl., ¶ 18.  From time to time, Icefrog would consider ideas submitted by fans of the game, including a small "inner circle" of players and beta testers.  *Id.*, ¶ 23.  If Icefrog liked an idea posted online by a fan or sent to him by instant messenger, Icefrog would (at his discretion), implement the idea (or a part of it) into the next updated version of the game or into a beta version for testing.  *Id.*, ¶¶ 24-26.  However, these proposed changes were always at a conceptual level, in the form of ideas or suggestions.  *Id.*  If Icefrog liked the suggestion, he was the one who would turn it from an idea into tangible, playable game content.  *Id.*, ¶ 25, 27-28.  Icefrog also ran organized, invite-only beta tests of new, pre-release updates of the game, during which Icefrog would observe the game being played and conduct post-game discussion and feedback sessions.  Baker Depo., 94:6-102:13; Icefrog Decl., ¶ 24.  Sometimes Icefrog would take into account the feedback from these beta tests, sometimes he would not.  Baker Depo. 102:14-103:1; Icefrog Decl., ¶ 24.

The penultimate version of DotA (version 6.83, presently available for download on Icefrog's website playdota.com) contains more than 100 heroes, hundreds of items, and more than

1    400 spells and powers.  Icefrog Decl., ¶¶ 2, 8.  No one other than Eul, Guinsoo, or Icefrog has

2    claimed to be an author or co-author of DotA (or Dota 2).  This includes uCool's witness Derek

3    Baker (a/k/a "Terrorblaze"),[3] who claims that he made substantive contributions to DotA but has

4    expressly **disclaimed** any ownership rights in DotA.  Baker Depo., 242:7-21 ("***I do not believe I***

5    ***own DotA or Dota Allstars.***") (emphasis added).

6        **The Author Assignments.**  Eul and Icefrog have assigned all of their rights in DotA to

7    Valve.  *See* LaFond Decl., Ex. F, G.  Blizzard has acquired all of Guinsoo's rights in DotA.

8    LaFond Decl., Ex. C; Mayer Decl., Exs. 8 & 9.  Also, Neichus has quitclaimed to both Blizzard

9    and Valve any rights that he might have possessed in DotA, including any accrued claims.

10   LaFond Decl., Ex. I.[4]  DotA continues to be distributed for free via Icefrog's website

11   (www.getdota.com) and can (only) be played using Blizzard's multiplayer game servers while

12   simultaneously running Warcraft III.  Icefrog Decl., ¶ 2.

13       **Valve's Dota 2.**  Dota 2 is a full-featured standalone computer game that does not use

14   Warcraft III's code, engine, or graphics.  Icefrog Decl., ¶ 34.  Dota 2 heroes were inspired by Dota

15   heroes.  *Id.*, ¶ 35.  The Dota 2 hero artwork is original, but the Valve designers attempted to

16   capture the essence and personality of the DotA predecessors.  *Id.*  Dota 2 also includes substantial

17   original work that does not have a DotA counterpart.  *Id.*  Also, in some cases, hero powers and

18   abilities have been modified or redesigned, and all hero powers and abilities are represented in the

19   _____

20   [3]  In September 2016, uCool located and contacted Baker. ████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████  *Davis v. Blige*, 505 F.3d 90, 101-07
     (2d Cir. 2007).

23   [4]  Neichus's assignment is not necessary for Valve to demonstrate standing because, to the extent
     he has any rights, he would be, at most, a joint author of the game with Guinsoo and Icefrog, since

24   he collaborated with both of them.  Icefrog Depo, 33:20-25.  Regardless, Plaintiffs have standing
     to bring claims on behalf of Neichus because (1) they acquired any and all accrued causes of

25   action, *see Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 961 (N.D. Cal. 2010), and (2) this Court
     had jurisdiction over the action when it was filed.  *See Infodek, Inc. v. Meredith-Webb Printing*

26   *Co.*, 830 F. Supp. 614, 620 (N.D. Ga. 1993) ("[A]n assignment of interest should be recognized
     provided the assignment occurs before trial, the plaintiff is a real party in interest in at least one

27   other claim, and the defendant suffers no prejudice from its recognition."); *Intimo, Inc. v. Briefly
     Stated, Inc.*, 948 F. Supp. 315, 318 (S.D.N.Y. 1996) (same).  *Minden Pictures, Inc. v. John Wiley*

28   *& Sons, Inc.* 795 F.3d 997 (9th Cir. 2015), is inapposite, because (unlike here) when the plaintiff
     filed the case he did not have standing to bring ***any*** claim and thus the court lacked ***jurisdiction***.

Mitchell
Silberberg &
Knupp LLP

game using new, updated animations and brand new artwork. *Id.* These new materials are original to Valve. *Id.*

**DotA Legends and Heroes Charge.** uCool is the owner of "Heroes Charge," which is itself a copy of the mobile game "DotA Legends," owned by defendant Lilith. *See* 9/23/15 Order in *Lilith Games (Shanghai) Co. Ltd. v. uCool, Inc. et al.*, Case No. 3:15-cv-01267-SC (Dkt. 117). "Heroes Charge" is a team-based mobile game in which the player creates a team of five heroes from a roster of heroes. FAC, ¶ 37. Each of uCool's heroes[5] mimics a popular DotA and Dota 2 hero, with the same (or highly similar) skills and abilities possessed by the DotA or Dota 2 hero. *Id.*, ¶¶ 40-41, 45-47. Then, uCool (1) depicted each hero using artwork derived from Dota 2 or from Blizzard's Warcraft games or related products, (2) created cities or locations that are similar to those depicted in Blizzard's Warcraft games, (3) copied artwork used in Warcraft III, DotA, and Dota 2 to represent hero skills, and (4) used music from "World of Warcraft" as the game's soundtrack. FAC, ¶¶ 42-54. There can be no good faith dispute that Heroes Charge (and DotA Legends) were modeled on Plaintiffs' games.

**Procedural History.** Plaintiffs filed their First Amended Complaint on January 8, 2016. Dkt. 36. On February 8, 2016, uCool filed a Motion to Dismiss, arguing that because Eul purportedly abandoned his rights in DotA, Valve could not assert a claim for Dota 2. Dkt. 44. The Court denied uCool's Motion, but permitted uCool to file an early motion for summary judgment on its abandonment affirmative defense. uCool confirmed that it would promptly file a motion for "summary judgment, with a full record developed ***on the narrow issue of copyright abandonment***" (emphasis added). Dkt. 77. uCool did not make good on its expressed intention to take "narrow" discovery, but rather engaged in a one-sided, seven-month discovery war in which it demanded discovery on a vast array of topics. uCool also shifted its approach and began to claim that anyone who worked on a DotA hero "owns" that hero. Now, uCool all but admits that it cannot dispose of the entirety of any of Valve's claims, but seeks only to narrow its damages by attacking ownership of particular heroes in the game, not ownership of the copyright in the DotA

---

[5] When this lawsuit was filed, Heroes Charge featured 60 heroes (not 80, as uCool claims). uCool has never disclosed what heroes it added to the game since then.

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

1    game itself.

2    **IV.     THE LEGAL STANDARD.**

3          While Valve bears the burden of persuasion *at trial* on the issue of ownership, to defeat

4    uCool's motion Valve need only present evidence sufficient that, drawing all inferences in its

5    favor, a jury could *reasonably determine* that it owns the copyrights to the works at issue.  *See*

6    *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1069 (9th Cir. 2016) (summary judgment

7    inappropriate when a reasonable factfinder could find that the evidence showed plaintiff was

8    "sufficiently in control of its artistic contribution to qualify as a joint author"); *U.S. Auto Parts*

9    *Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1020-21 (9th Cir. 2012) (reversing summary

10   judgment where facts were sufficient for a jury to reasonably conclude that plaintiff owned the

11   copyright in a software program, even though the ownership determination "required a long trip

12   through a previously unexplored intersection of the Copyright Act[]"); *see also Ahanchian v.*

13   *Xenon Pictures, Inc.*, 403 Fed. Appx. 166, 169 (9th Cir. 2010) (reversing summary judgment

14   where authorship issues were the subject of "hotly disputed" testimony).  In deciding a motion for

15   summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in

16   the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith*

17   *Radio Corp.*, 475 U.S. 574, 587 (1986).

18         Moreover, where, as here, uCool does not claim to own the work at issue, uCool cannot

19   merely point to hypothetical rights that others might have but have never claimed.  *Complex Sys.*

20   *v. ABN AMBRO Bank N.V.*, 979 F. Supp. 2d 456, 475 (S.D.N.Y. 2013) ("The law is clear that a

21   party accused of infringement cannot defeat that claim by pointing to rights that another may have

22   to the work in question."); *Homeowner Options for Mass. Elders, Inc. v. Brookline Bancorp, Inc.*,

23   789 F. Supp. 2d 242, 244 (D. Mass. 2011) (rejecting attempt by non-author to challenge the

24   validity of copyright where no actual potential authors of the work had disputed the copyright

25   holder's ownership).  In fact, uCool's hypothetical alternative owners not claimed any ownership

26   rights, and any claim of joint ownership or authorship by them is long since time-barred.  *Zuill v.*

27   *Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996).  Thus, uCool cannot establish *as a matter of law*

28   that Valve is *not* the owner of DotA; *nor* can it establish that some other third party *is* the owner.

1

**V.    THE FACTUAL RECORD IS SUFFICIENT FOR A JURY TO REASONABLY CONCLUDE THAT VALVE IS AN OWNER OR CO-OWNER OF DOTA.**

2

Copyright subsists in "original works of authorship fixed in any tangible medium of

3

expression." 17 U.S.C. § 102.  Plaintiffs' infringement claims are based on several works of

4

authorship, including Warcraft III and Dota 2 (both of which were timely registered with the

5

Copyright Office, *see* 17 U.S.C. § 410(c)).  In this Motion, uCool is not challenging Blizzard's

6

ownership of Warcraft III or Valve's ownership of Dota 2.[6]  Instead, uCool challenges only

7

Valve's ownership rights in ***DotA***, which is a derivative work of Warcraft III and the predecessor

8

to Dota 2.  uCool argues that, because elements of Dota 2 are derived from DotA, Valve cannot

9

sue for uCool's infringement of Dota 2 to the extent (and only to the extent) that those elements

10

also appear in DotA because Valve will "never be able to demonstrate" its ownership of DotA.

11

Mot. at 2.  uCool's Motion fails because a jury could reasonably determine that Eul, Guinsoo, and

12

Icefrog are joint authors of DotA, and thus Valve, as assignee of Eul and Icefrog's rights, has

13

standing to sue both for DotA ***and*** Dota 2.

14

**A.    Eul, Guinsoo, And Icefrog Are Joint Authors Of DotA.**

15

The "original work of authorship" at issue in this Motion is DotA, which is a computer

16

game – and thus is simultaneously a "computer program" and an "audiovisual work."  17 U.S.C.

17

§ 101; *Broderbund Software, Inc. v. Unison World, Inc.*, 648 F. Supp. 1127, 1133 (N.D. Cal.

18

1986) ("[C]opyright protection is not limited to the literal aspects of a computer program, but

19

rather [] it extends to… its audiovisual displays.").  *See also* Mot. at 3, n.3 (noting that software

20

copyright protects both "literal" and "non-literal" elements).[7]  DotA is "fixed" in the DotA game

21

---

22

[6]  Critically, uCool does ***not*** argue that Valve cannot bring a claim based on expressive elements that are wholly original to Dota 2, such as the artwork and designs created by Valve and the

23

particular look, feel, and function of heroes (and relationship among the heroes) as they appear in Dota 2.  uCool has copied these aspects of Dota 2, but because discovery has been stayed, Valve

24

has not yet determined the full scope of uCool's infringement.  *See* FAC, ¶ 51 & Ex. A p. 17 (reflecting artwork copied from Dota 2).  Additionally, uCool has misleadingly cited Valve's

25

interrogatory response for the proposition that Dota 2 heroes appeared in DotA, but ignored Valve's statement that "significant additional expression… was added to Dota 2 that was not

26

present in DotA."  LaFond Decl., Ex. J at 5.

27

[7]  uCool's claim that it did not copy DotA source code (Mot. at 23) misses the point.  The fact that all of DotA's programming was done by the DotA Authors is confirmation of their control and

28

superintendence of the work.  Moreover, it is the source code that operates the game (including its "nonlinear elements") and controls how the heroes and other interactive elements behave.

Mitchell
Silberberg &
Knupp LLP

CASE NO. 3:15-cv-04084-CRB

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    files and in the computer code that comprises those files.  *See Micro Star*, 154 F.3d 1111 (video

2    game mods are fixed in a "concrete or permanent form").  When the DotA game files are

3    combined with the Warcraft III game client, a fully playable audiovisual work is rendered.  *Id.* at

4    1110.  In the DotA game, players select, control, and upgrade playable hero units; connect to,

5    communicate with, and fight with and against other players and artificial intelligence units; and

6    participate in a variety of animated activity as the game unfolds on their computer screen in a

7    different way each time.  Sommer Decl., ¶ 8; Icefrog Decl., ¶ 8.  In its present form, DotA

8    contains more than 100 heroes, including each of the 57 heroes at issue in this action.  Icefrog

9    Decl., ¶ 22.  Those heroes have been substantially modified over time and represent a cohesive

10   cast of characters with unique stories whose skills, abilities, and expression have been

11   meticulously balanced and tuned and who complement and challenge each other in a carefully

12   designed way.  Icefrog Depo., 207:8-23; Icefrog Decl., ¶¶ 8, 22.

13        The evidence establishes that Eul, Guinsoo, and Icefrog are the "authors" of DotA.  In the

14   Ninth Circuit, legal "authorship" is governed by *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir.

15   2000).  In *Aalmuhammad*, the Ninth Circuit analyzed the meaning of "authorship" in the context

16   of whether an individual who provided some creative assistance with director Spike Lee's motion

17   picture "Malcolm X" could claim an authorship stake in the film.  In finding that the "author" of

18   the film was director Spike Lee, and not the plaintiff (notwithstanding his fairly significant

19   contributions), the court held that an "author" is the person who "superintends" the work by

20   exercising control.  This will likely be a person "who has actually formed the picture by putting

21   the persons in position, and arranging the place where the people are to be – the man who is the

22   effective cause of that," or "the inventive or master mind" who "creates, or gives effect to the

23   idea."  *See also Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (the

24   "author" of a work is the person "who actually creates the work, that is, the person who translates

25   an idea into a fixed, tangible expression entitled to copyright protection."); *Burrow-Giles*

26   *Lithographic Co. v. Sarony*, 111 U.S. 53, 61 (1884) (the author is "the person who has

27   superintended the arrangement" of the work, and authorship involves "producing, as the inventive

28   or master mind, the thing which is to be protected"); *Whelan Assocs., Inc. v. Jaslow Dental Lab.*,

*Inc.*, 609 F. Supp. 1307, 1318 (E.D. Pa. 1985), *aff'd*, 797 F.2d 1222 (3d Cir. 1986) (author of software was the person who, using her expertise and creativeness, "made the system operate as a successful and useful business tool.").

Like the directors or producers of a motion picture, the "inventives" or "masterminds" behind DotA were Eul, Guinsoo, and Icefrog.  uCool admits that DotA first was created by Eul in 2002, and that Eul "created the original DotA gameplay rules and sequence and the original set of DotA characters."  Mot. at 4.  With Eul's permission, Guinsoo and then Icefrog became the developers of DotA, together turning Eul's work into a fully featured, expansive, highly competitive game played by millions of people.  Their role as game developers was a highly creative one that involved thousands of hours of designing, programming, balancing, testing, bug fixing, updating, and in some cases selecting and supervising a small team of helpers or testers.  As game developers, Eul, Guinsoo, and Icefrog exercised total control over the game, did the programming, were responsible for every decision (including all decisions pertaining to content), and had discretion and final say into everything that happened with the game.  *Lindsay v. R.M.S. Titanic*, 52 U.S.P.Q.2d 1609, 1614 (S.D.N.Y. 1999) (author of film was director who "retained what appeared to be exclusive authority over what was included in the footage").  As uCool's witness testified: "when [Guinsoo] says 'Jump,' you say 'How high'?  You know, he was the lead developer, and he was in charge of all development.  Anything that he wanted to happen in the game, it happened."  Baker Depo., 30:12-25; 87:18-88:8.  The same holds true for Eul and Icefrog during their tenures.  *See* Icefrog Depo., 55:1-13, 323:3-326:8.  *See also* Baker Depo., 89:25-91:7, 95:13-97:1, 112:1-7.

Moreover, all of the work done by Eul, Guinsoo, and Icefrog was done to further their vision and conceptual goals.  Icefrog Decl., ¶ 19; Feak Depo., 236:20-24; Sommer Decl., ¶ 14.  To the extent that they accepted or listened to any feedback or suggestions from fans or DotA players, such contributions were "helpful recommendations," which the DotA Authors were "not bound to accept" and would not benefit the work in any manner "unless [the DotA Authors] chose to accept them."  Feak Depo., 198:23-200:22; Baker Depo. 201:11-202:10.  Guinsoo and Icefrog retained ultimate and absolute discretion to determine which suggestions would be implemented and how.

Mitchell
Silberberg &
Knupp LLP

1  Icefrog Depo., 37:7-15, 42:1-4.  In fact, Guinsoo and Icefrog "locked" the game file so that, from

2  a technical standpoint, it would not be possible to change it without their permission.  Moss Depo.,

3  52:11-54:9.  Nobody other than Eul, Guinsoo, or Icefrog has ever claimed to be an author or joint

4  author of DotA; there would be no legal basis for any such claim.  *See*, *e.g.*, *Seshadri v. Kasraian*,

5  130 F.3d 798, 803 (7th Cir. 1997) ("The assistance that a research assistant or secretary or

6  draftsman or helpfully commenting colleague provides in the preparation of a scholarly paper does

7  *not* entitle the helper to claim the status of a joint author.").

8      Finally, the evidence establishes that each of the DotA Authors was a ***joint*** author of the

9  overall work because each made material contributions of copyrightable expression to DotA "with

10  the intention that their contributions be merged into inseparable or interdependent parts of a

11  unitary whole."  17 U.S.C. § 101.  It was Eul's expressed intention when he turned over

12  development of DotA to others that they would build on his work and "credit" him as an author.

13  Sommer Depo., 65:25-66:20; Sommer Decl., ¶¶ 15, 18-19.  Likewise, it was Guinsoo's intention

14  when he turned development of the game over to Neichus and Icefrog that they would continue to

15  develop his work.  Feak Depo., 218:16-220:17 ("[Y]ou knew it was going to be worked on after

16  you departed?  Yes, absolutely, ***and that was the intention***.") (emphasis added).  And, it was

17  Icefrog's intention to build on the work that Guinsoo had done, which he did with Guinsoo's

18  "blessing."  Icefrog Depo., 248:7-249:4.  Eul, Guinsoo, and Icefrog have referred to each other as

19  co-authors of DotA, and they have publicly and privately acknowledged each other's respective

20  roles and status.  Icefrog Depo., 65:11-18; Sommer Depo., 119:5-9.  *See also* Moss Depo., 18:20-

21  19:1.

22      In other words, it was clear to all of the DotA Authors that they were links in a larger

23  overall chain, even if they did not know when they started their work precisely who the next link

24  would be or how the project would evolve along the chain.  That is sufficient to constitute joint

25  authorship.  *See Donna v. Dodd, Mead & Co.*, 374 F. Supp. 429, 430 (S.D.N.Y.1974) ("Although

26  traditionally creation of a joint work required a common design which existed before the elements

27  of the work were produced, that requirement has been considerably eroded."); *see also Shapiro v.

28  Jerry Vogel Music Co.*, 221 F.2d 569, 570-71 (2d Cir. 1955) (to determine intent, look to consent

Mitchell
Silberberg &
Knupp LLP

1  of first author to collaboration by second author at the time of the collaboration).  *See Morrill v.*

2  *Smashing Pumpkins,* 157 F. Supp. 2d 1120 (C.D. Cal. 2001) (music videos were joint works

3  where music was written before the intent to create the music videos arose); *Edward B. Marks*

4  *Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir. 1944) ("It makes no difference

5  whether the authors work in concert, or even whether they know each other; it is enough that they

6  mean their contributions to be complementary in the sense that they are to be embodied in a single

7  work to be performed as such."); *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1145-46 (C.D.

8  Cal. 2007) (joint authors worked four years apart:  "[C]ontemporaneous and coordinated action…

9  is not required.").

10        As authors of DotA, Eul, Guinsoo, and Icefrog initially were its copyright owners.  17

11  U.S.C. § 201 ("Copyright in a work protected under this title vests initially in the author or authors

12  of the work.  The authors of a joint work are co-owners of copyright in the work.").  When Icefrog

13  and Eul assigned their rights in DotA to Valve in 2010, Valve became the owner of their rights.

14  17 U.S.C. § 201(d) ("The ownership of a copyright may be transferred in whole or in part by any

15  means of conveyance…").  When Blizzard acquired Guinsoo's rights, those rights became owned

16  by Blizzard, the other Plaintiff in this action.  Thus, *either* Plaintiff can sue for the *entirety* of the

17  work.  *Corbello v. Devito*, 777 F.3d 1058, 1065-66 (9th Cir. 2015) (noting "well-settled principle

18  of copyright law: the right of one joint-owner to sue third-party infringers without joining any of

19  his fellow co-owners").[8]  For this reason, uCool's motion fails.

20        **B.      Individuals Who Purportedly Suggested Ideas For Certain DotA Heroes Are**

21                **Not Owners Of Those Discrete DotA Heroes.**

22        uCool does not claim that it or anyone other than Plaintiffs or their assignors is an author

23  or joint author of DotA.  Nor can it.  *See, e.g.*, *Aalmuhammed*, 202 F.3d at 1233 ("A creative

24  contribution does not suffice to establish authorship.").  Instead, uCool plays fast and loose with

25

26  [8]  There is ample support for joint authorship.  But even if DotA is not a joint work, Eul is the
author of his original versions of DotA and Guinsoo and Icefrog are co-authors of the current

27  version of DotA.  At *minimum*, Eul, Guinsoo, and Icefrog are authors of all of their more than 200
cumulative versions of DotA.  The result is exactly the same.  Moreover, since both Blizzard and

28  Valve are plaintiffs in this action, it makes little sense for uCool to argue that they cannot both join
together to sue for the entirety of the work.

Mitchell
Silberberg &
Knupp LLP

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

the facts and the law of copyright authorship, arguing that anonymous DotA players and testers who go by Internet names such as Terrorblaze, Cottontop, ShadowPenguin, Afrothunder, and others, while admittedly not authors of the ***DotA game***, may nevertheless be the authors or owners of particular, discrete pieces of DotA into which they had input.  Specifically, uCool claims that because these people may have "proposed" hero concepts or suggestions via instant messages or in chatrooms, ***they*** "own" the DotA heroes they suggested or proposed (Mot. at 15), even though there is no tangible evidence of what their input actually was, and they have never claimed to be owners either of DotA or of the characters they helped ideate.  uCool's claim is unsupported by the law and the facts, which are, at best, disputed on this point.

### 1. Copyright Does Not Subsist In Individual Contributions To An Integrated Audiovisual Work Such As DotA.

The law is absolutely clear that individuals who contribute to a creative work do not obtain a copyright in their individual or discrete contributions, concepts, and ideas.  In *Garcia v. Google*, 786 F.3d 753 (9th Cir. 2015), an actress claimed that she possessed a separate copyright in her five-second acting performance in a motion picture and thus could seek injunctive relief to prevent the distribution of that performance.  The Ninth Circuit, sitting *en banc*, rejected her claim, holding that in the case of an audiovisual work the copyright subsists in the work itself, not in the discrete contributions embodied therein:

> Garcia's theory of copyright law would result in the legal morass we warned against in *Aalmuhammed* – splintering a movie into many different "works," even in the absence of an independent fixation.  Simply put, as Google claimed, it "make[s] Swiss cheese of copyrights."  Take, for example, films with a large cast…  Treating every acting performance as an independent work would not only be a logistical and financial nightmare, it would turn cast of thousands into a new mantra:  copyright of thousands.  *Id.* at 742-43.

Other courts have come to the same conclusion, including the Second Circuit in *16 Casa Duse LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015), which rejected the claim that a plaintiff was, or could be, the owner of copyright in his particular creative contributions to a motion picture.  As the court noted, "filmmaking is a collaborative process typically involving artistic contributions from a large number of people, including – in addition to producers, directors, and screenwriters – actors, designers, cinematographers, and a host of skilled technical contributors.  If copyright

Mitchell
Silberberg &
Knupp LLP

1  subsisted separately in each of their contributions to the completed film, the copyright in the film

2  itself, which is recognized by statute as a work of authorship, could be undermined by any number

3  of individual claims." 791 F.3d at 258.  Thus, "inseparable contributions integrated into a single

4  work cannot separately obtain [copyright] protection." *Id.* at 258.  *See also Richlin v. Metro-*

5  *Goldwyn-Mayer Pictures, Inc.* 531 F.3d 962, 975 (9th Cir. 2008) (same); *Donen v. Paramount*

6  *Pictures Corp.*, 89 U.S.P.Q.2d 1470, 1473-74 (C.D. Cal. 2008) (plaintiff not entitled to a

7  copyright in a dance scene because a motion picture is a unitary work and "[a]s such, even

8  assuming the Dance Scene is a copyrightable component, no separate copyright currently exists.").

9       This is precisely the case here.  The "original work of authorship" at issue is the DotA

10  *game*, which was created, programmed, and controlled by the DotA Authors, features the heroes at

11  issue in this lawsuit, and is the ***only*** place where DotA heroes exist in any tangible, playable form.

12  Icefrog Decl., ¶ 8.  DotA is a complete and unitary work of authorship (i.e., a computer game), and

13  contributions to that work, such as ideas or concepts for heroes, "merge to create a unitary whole."

14  *See Richlin*, 531 F.3d at 975 ("A motion picture is a work to which many contribute; however,

15  those contributions ultimately merge to create a unitary whole."); Icefrog Decl., ¶ 8.  uCool admits

16  as much.  *See* Mot. at 4 (DotA was "a different game genre").  As a result, any design input

17  provided by anonymous alleged contributors was simply a contribution into the overall work, and

18  not a separate copyrighted work.  Ownership of the DotA game includes ownership of all of the

19  integrated content contained therein.  *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900

20  F. Supp. 1287, 1302 (C.D. Cal. 1995) ("[O]wnership of a copyright in a film confers copyright

21  ownership of any significant characters as delineated therein.").  *See also Jarvis v. K2 Inc.*, 486

22  F.3d 526, 531 (9th Cir. 2007) (distinguishing a collective work from a joint work where "separate

23  elements merge into a unified whole").

24       uCool does not cite a single case to support its piecemeal approach to copyright law.  That

25  is not surprising.  Taken to its logical end, uCool's argument would confer tiny pieces of copyright

26  ownership on every person who gave input into content for a novel, motion picture, video game,

27  or other audiovisual work – thereby giving each such person the ability to prevent the true, legal

28  author of a work from exploiting or enforcing the copyright in that work.  This would include, for

example, the *Star Wars* fan who posts ideas for new alien races on a fan website, the film critic who makes helpful comments to a director about story changes after seeing a preview, or the novelist's spouse who suggests how a fictional character might behave. *Garcia*, *Merkin,* and *Aalmuhammed* cautioned against this precise result. *Merkin,* 791 F.3d at 258-59 ("We doubt that Congress intended for contributors who are not joint authors to have greater rights enabling them to hamstring authors' use of copyrighted works, as apparently occurred in the case at bar. We agree with the *en banc* Ninth Circuit, then, that the creation of "thousands of standalone copyrights" in a given work was likely not intended."). *See also Aalmuhammed*, 202 F.3d at 1236 ("Claimjumping by research assistants, editors, and former spouses, lovers and friends would endanger authors who talked with people about what they were doing."). It would be especially bizarre here, since no one that uCool claims to have such an interest in DotA.

### 2.      DotA Is Not A "Collective Work" And Hero *Ideas* Are Not Works Of Authorship.

In an effort to overcome the law and turn each and every anonymous contribution to DotA into a separate copyrighted work, uCool has claimed that DotA is a "collective work," comprised of hundreds or thousands of stand-alone and separately copyrightable contributions. 17 U.S.C. § 101 (defining "collective work" as a "work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."). uCool does not offer any legal or factual support for its claim, and the evidence that does exist – including the testimony of uCool's own witness – is squarely to the contrary.

DotA is not analogous to a periodical issue, anthology or encyclopedia. Nor is it a collection of separate mini-games or game pieces. It is an integrated audiovisual work. Likewise, the DotA Authors were not "editors" of any such separate works; they were authors of the entire audiovisual work. Despite more than six months of discovery, uCool cannot point to a single example of any ***copyrightable*** "separate and independent ***work of authorship***" authored by ***any*** third party that it claims was "assembled" into DotA. And to the extent it claims that the DotA heroes are "independent works," uCool has offered no documentary or tangible evidence to

1   support this claim.  uCool cannot even produce a single message board post or chat log reflecting

2   any of the purported hero "concepts" on which its argument rests – far less some working version

3   of a hero that existed anywhere other than within the DotA game as an integrated unit.  Mot. at 16.

4   uCool and its witness acknowledge that no such documents exist.  Baker Depo., 77:2-19; 80:21-

5   23; 103:2-103:16; 106:3-107:24; 135:23-25; 143:7-14; 148:10-22; 174:15-23.[9]

6       As for the evidence that is in the record, it confirms that Terrorblaze, ShadowPenguin, and

7   the others contributed, at most, unprotectable *ideas*, which they "proposed" to Guinsoo and

8   Icefrog with the hope and intention that ***Guinsoo and Icefrog*** would consider them when ***they***

9   created new content.  Baker Depo., 108:12-109:17; 112:21-114:6; 141:9-142:3; 170:5-14.  Icefrog

10  Depo., 293:19-24; Moss Depo. 44:13-49:18; Feak Depo., 205:8-19; Icefrog Decl., ¶¶ 23-29.

11  uCool's witness even refers to his contributions as "ideas" no fewer than four times in his

12  declaration.  Baker Decl., ¶¶ 4 ("I began sending Guinsoo my ***ideas*** for characters and character

13  skills."); 7 ("I sent Neichus fully formed ***ideas*** for characters…"); 8 ("I began to communicate

14  with… Icefrog about my ***ideas***…"); 10 ("I would send Icefrog fully formed ***ideas***.") (emphasis

15  added).  These ideas were purely conceptual and incomplete.  Baker Depo., 41:9-18; Moss Depo.,

16  23:22-24:6.[10]  They cannot give rise to a separate copyright because copyright protection extends

17  only to fixed works of authorship, and not to ideas.  17 U.S.C. § 102(b) ("In no case does

18  copyright protection for an original work of authorship extend to any idea… regardless of the form

19  in which it is described, explained, illustrated, or embodied in such a work."); *Whelan*, 609 F.

20

21  [9]  The only documents in evidence (Exs. T, U, and V to the LaFond Declaration) reflect ideas for
    potential heroes that were never created.  They also confirm the abstract nature of the hero
22  suggestions.  *See*, *e.g.*, Ex. T at 2 ("***Think*** Rhasta's Mass Serpent Wards, except with Tentacles.").
    Baker's testimony purporting to remember other forum posts (Baker Decl., ¶ 5) runs afoul of the
23  "best evidence" rule.  FRE 1002; *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986)
    ("When the contents of a writing are at issue, oral testimony as to the terms of the writing is
24  subject to a greater risk of error than oral testimony as to events or other situations.").

25  [10]  For example, Terrorblaze testified that for Abbadon, he sent Icefrog a message that "went along
    the lines of… we wanted to have…. kind of a death knight modeled character… somebody who
26  could be a semi-support character, but still potentially carry his team."  Baker Depo., 134:11-
    135:11; Icefrog Depo., 312:7-25.  Icefrog then did the work to create the actual hero.  Baker
27  Depo., 140:18-141:8.  This was the process for all of the various heroes that purportedly were
    created by Terrorblaze, Cottontop, and others.  *See*, *e.g.*, Baker Depo., 138:2-14, 140:4-14, 147:3-
28  149:13, 150:21-158:1, 160:12-18; 162:1-164:2, 164:10-168:20; 170:18-172:4; 176:17-178:4;
    180:9-181:7; 188:11-190:2; Icefrog Depo., 33:7-34:15.

Mitchell
Silberberg &
Knupp LLP

1   Supp. at 1307 (architectural drawings are not owned by one who gives his ideas to the architect,

2   "no matter how detailed the ideas…"); *TMTV, Corp. v. Mass Prods., Inc.*, 345 F. Supp. 2d 196,

3   205 (D.P.R. 2004) (rejecting authorship argument where"[t]he most that could be said is that he

4   may have brought up certain ideas at the brainstorming session, either verbally or in writing.").

5         Moreover, all hero proposals were just that – proposals.  There was never any

6   understanding by any contributor that the idea he proposed or suggested would necessarily make it

7   into the game.  Baker Depo., 109:25-111:19.  Only Guinsoo and Icefrog had that power, and they

8   had absolute and total discretion as to how they wished to exercise it.  Icefrog Decl., ¶¶ 23-29.  As

9   uCool's witness explained: "[I]t was [Icefrog's] prerogative to do ultimately what he wanted."

10   Baker Depo., 142:15-22; *see also id.*, 109:25-111:19, 112:1-7, 178:16-179:16; Moss Depo, 32:9-

11   13.  If, as uCool claims, Terrorblaze and the others proposed some ideas for the game, and those

12   ideas were taken into account by the DotA Authors, that would simply make them contributors,

13   and not authors either of the game or any of its constituent parts.  *See Aalmuhammed*, 202 F.3d at

14   1231-32 (plaintiff not an author even though he "suggested extensive script revisions," "created at

15   least two entire scenes with new characters," "edited parts of the movie during post production,"

16   "rewrote several specific passages of dialogue" and "wrote scenes… that were enacted in the

17   movie.").[11]

18         Finally, a hero idea is not game content, even if communicated via instant message or

19   forum post.  DotA is not a collection or arrangement of messages, it is an interactive computer

20   game.  None of the heroes would have existed without being created and implemented by Guinsoo

21   or Icefrog.  *See Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1118-19 (E.D.

22   Cal. 2010) ("Under the Copyright Act… ideas are not protected.  Rather, the execution of the

---

[11]  uCool has attached as an exhibit to the LaFond Declaration a "chart" that purports to summarize who uCool contends "created" certain DotA heroes.  For the reasons set forth herein, the chart is irrelevant and uCool's use of the term "created" is misleading.  Moreover, many of uCool's assertions are not supported (or are contradicted) by the testimony.  *See* Mayer Decl., ¶ 19 & Ex. 11.  *See also* Feak Depo. 10:7-11:12; 122:14-123:7; 124:3-125:6; 127:15-128:12; 133:5-135:20;143:13-144:21; 154:22-155:25; 159:5-160:5; 165:10-166:8; 168:3-168:22; 169:15-24; 197:13-199:23; 201:12-203:1; 205:8-206:2; 240:5-243:11; Moss Depo. 87:20-90:21; 97:22-99:13; 116:3-117:3; 121:10-121:17; 124:4-14; Baker Depo. 146:12-152:25; 170:15-175:1; 192:1-10; 195:20-196:5; 373:20-374:15; Sommer Depo. 72:13-15; 78:19-79:9; 175:7-176:8; 222:14-223:18; 225:24-226:6.

ideas are protected, and the author of the execution of the ideas becomes vested in the intellectual property."); Baker Depo., 162:1-12 ("I'm presenting an *idea*, and [Icefrog is] implementing it.") This was not a matter of simply "inputting" a suggestion.  Icefrog Depo., 299:2-301:25; 314:9-315:15.  Guinsoo and Icefrog were required to create and code the hero and its skills, design and develop animated spell and ability effects, test the hero, and then modify all of the other heroes in the game in order to accommodate the new hero.  Baker Depo., 120:15-19; 121:14-20; 143:3-6; 163:8-164:2; Icefrog Decl., ¶¶ 23, 25, 27-28.  This work required a great deal of effort, discretion and creativity, and Guinsoo and Icefrog performed it on their own and without ceding any control (including creative control) to anyone else.  *Id.*; Feak Depo.,197:13-198:8; Icefrog Decl., ¶¶ 23-28.  By contrast, Terrorblaze admitted that while he had ideas for characters, he lacked the skill to do anything with those ideas.  Baker Depo., 119:11-121:20. [12]

## VI.     EUL DID NOT ABANDON HIS COPYRIGHT.

In an attempt to limit the scope (but not the fact) of its copyright infringement, uCool has argued that Eul abandoned his copyright in DotA in 2004, and thus Valve cannot sue for those particular aspects of DotA derived from Eul's versions.  uCool ignores that copyright abandonment is an *affirmative defense* on which Defendants bear the burden of proof at trial.  *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001).  Thus, to prevail on this

---

[12]  uCool apparently suggests that a few DotA heroes were inspired by heroes that may have first appeared in unknown alternative "versions" of DotA (e.g., "Darkness Falls"), and thus Plaintiffs cannot "own" these heroes.  *See*, *e.g.*, Feak Depo., 145:4-11 (noting that Luna Moonfang was inspired by an earlier "moon-based character").  uCool does not offer any evidence of any of these alternative "versions," including what was contained in them or who authored them.  In any event, the argument ignores that Plaintiffs' copyright is in the DotA *game*, not individual heroes.  Eul, Guinsoo and Icefrog are authors of the DotA game, and by 2015 every aspect of the game had been reworked by them, including the heroes.  *See Metro-Goldwyn-Mayer v. American Honda Motor Co.*, 900 F. Supp. 1287, 1303 (plaintiff could sue for infringement of James Bond, even though he appeared in other books and movies, because "Plaintiffs own the copyright to the James Bond character as expressed and delineated in their 16 films.") (emphasis added).

Even if there were evidence to support uCool's claim (which "evidence" Plaintiffs dispute, *see* Mayer Decl., Ex. 19), what uCool actually is arguing is that some small part of the expression that *uCool copied* is not original – not that the game is not *owned* by Plaintiffs.  That argument would affect only the scope of uCool's infringement liability and thus is not appropriate on this Motion.  *See Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1077 (9th Cir. 2000) (plaintiff's minimally creative photographs were copyrightable, and remanding to district court to determine "the scope of [plaintiff's] copyright in the photographs vis-à-vis the claimed infringement"); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (in assessing infringement, courts filter out and disregard non-protectible elements).

1    claim, **uCool** must prove, based on undisputed facts, "(1) an intent by the copyright holder to

2    surrender rights in its work; and (2) an overt act evidencing that intent." *Paramount Pictures*

3    *Corp. v. Carol Publ'g Group*, 11 F. Supp. 2d 329, 337 (S.D.N.Y. 1998).  uCool can prove neither,

4    and especially cannot prove the absence of any facts on which a reasonable jury could find for

5    Plaintiffs on this issue.

6         Eul did not intend to abandon or surrender his rights in DotA or to "dedicate DotA to the

7    public."  Sommer Depo., 64:2-65:4; Sommer Decl., ¶¶ 15-19.  His attestations of intent are not

8    contradicted by any objective evidence, or by any "overt act" evidencing an intent to abandon (in

9    fact, they are supported by the evidence).  The only evidence on which uCool's abandonment

10   claim is based is a 2004 forum post (the "WarCenter Post"), later referenced in Eul's assignment

11   agreement with Valve.  The WarCenter Post does not reflect an intent to "dedicate [DotA] to the

12   public" for unfettered for-profit exploitation – far less lend itself exclusively to that interpretation.

13   Instead, it can (and should) be read to reflect Eul's intent to license DotA (a not-for-profit

14   Warcraft III mod) to the DotA fan community to update the game and build on his work.[13]

15        Eul used the term "open source," which refers to a type of **license** by which a copyright

16   owner makes source code freely available for others to further develop, refine, and redistribute.

17   That is how Eul understood the term, based on norms in the modding community and his limited

18   knowledge of copyright law (he was only 18 at the time).  Sommer Depo., 64:20-65:4 ("Open

19   source is a license for others to use the code that I created."); Sommer Decl., ¶ 17; *see Jacobsen v.*

20   *Katzer*, 535 F.3d 1373, 1381 (Fed. Cir. 2008) ("Copyright holders who engage in open source

21   licensing have the right to control the modification and distribution of copyrighted material.").

22   Eul also deliberately limited the scope of his authorization to Warcraft III "**map**" files that were

23   "version[s] of DotA."  Sommer Depo., 64:2-65:4; Sommer Decl., ¶ 18.  The term "**map**" had a

24   specific meaning among the DotA community (i.e., a free Warcraft III mod).  Feak Depo., 96:20-

25   24.  *See also Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1114 (9th Cir. 1998) (video game

26   publisher did not abandon its copyright by permitting others to modify its games and make and

27

28   [13]  The anonymous user comments to the WarCenter Post cited in uCool's brief (Mot. at 4:22-23)
     are inadmissible hearsay, and also are irrelevant.

Mitchell
Silberberg &
Knupp LLP

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   distribute "mod files" such as DotA: "FormGen never overtly abandoned its rights to profit

2   commercially from new levels.").  Finally, Eul specifically demanded that those updating his game

3   give him credit as author and creator, also inconsistent with abandonment.  Sommer Depo., 66:6-

4   20; Decl., ¶¶ 18-19.

5         The recital in Eul's assignment to Valve (which he did not draft) also does not reflect a

6   contrary intent, and uCool intentionally distorts its language.

7

8                                                  That is consistent with his WarCenter post and the testimony.

9   Lynch Depo., 246:23-249:2.

10         *Wyatt Tech v. Malvern Instruments Inc.*, relied on by uCool, actually supports ***Valve's***

11   position.  There, the court found that (unlike Eul) the plaintiff had abandoned its copyright by

12   announcing that there were "***no restrictions***" on future use of the work.  However, the court

13   expressly noted that (unlike here), the plaintiff did ***not*** "suggest that the 'no restrictions' language

14   should be construed as a license (comparable to, for example, ***an open source license*** for source

15   code." 2009 U.S. Dist. LEXIS 66097, at *40, n. 18 (C.D. Cal. July 29, 2009) (emphasis added).

16   Additionally, the plaintiff did "not suggest that [it] may have abandoned ***certain*** rights conferred

17   by the Copyright Act, but not others relevant here" (i.e., a limited abandonment).  *Id.*  Here, the

18   evidence of an intent to license, and to impose restrictions on that license (i.e., to use Eul's work

19   only in other Warcraft III mods and only with credit) is supported by the plain language of the

20   WarCenter Post and the recital in the Eul's assignment.  Courts have denied summary judgment

21   on this issue, even where the facts were far less favorable to the plaintiff.  *See Melchizedek v. Holt*,

22   792 F. Supp. 2d 1042, 1052-53 (D. Ariz. 2011) (material issues of fact where Plaintiff wrote:

23   "personally I have never cared about copyrights.  I wanted the information to go out to the

24   world.").[14]

25

26

27   ───────────────

[14]  Eul's statement also is not equivalent to that of the plaintiff in *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F. Supp. 1392 (C.D. Cal. 1990), where the plaintiff specifically stated that "the information contained in this letter is protected by U.S. copyright law through noon EST on the 2d day after its release."

28

Mitchell
Silberberg &
Knupp LLP

**OPPOSITION TO UCOOL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## VII.   ICEFROG DID NOT ASSIGN HIS RIGHTS IN DOTA TO A THIRD PARTY.



## VIII.   BLIZZARD'S CLAIMS ARE NOT AT ISSUE IN THIS MOTION.

In a last-ditch effort to evade liability for its infringement of DotA and Dota 2, uCool makes the bizarre and premature argument that even though Blizzard plainly has an ownership interest in DotA (either through assignments from Guinsoo and Neichus, by virtue of its other contributions to DotA, namely the underlying Warcraft III game and World Editor, or by virtue of Blizzard's End-User License Agreements), if uCool prevails on this narrow Motion against Valve, Blizzard would be barred from bringing any claims for DotA under the doctrine of "claim splitting."[16]

uCool's attempt in this motion to preclude *Blizzard* from asserting claims concerning DotA is inappropriate.  uCool's Motion is directed only at Valve, and its Notice makes clear that it is seeking summary judgment that "*Valve* does not own any copyrights" or that "*Valve* does not own a copyright in … one or more of the following elements…."  Notice of Motion at ii.  uCool cannot attempt to shoehorn Blizzard's claims into this Motion via two paragraphs at the end.  Whether *Blizzard* might *separately* possess ownership rights in DotA or portions thereof is not, and cannot be, at issue in this Motion.

---

[15] 

[16] uCool's claim that Blizzard "is not asserting copyright ownership… of DotA" is false.  *See* FAC, ¶ 26.  The Court need not decide Blizzard's ownership claims at this time because Valve possesses sufficient rights to bring its claims in this action.

1       In any event, uCool's "claim splitting" argument is legally meritless and the doctrine has

2   no applicability here.  That argument is premised on its assumption either that (1) each DotA hero

3   is a separate copyrightable work, so Blizzard must separately sue for those heroes it owns (i.e.,

4   those conceived of by its predecessor, Guinsoo), or that (2) the DotA versions released by Guinsoo

5   from 2003 to early 2005 are each separate works, owned by Blizzard.  Neither is true, but even if

6   one of these theories did have merit, the "claim splitting" doctrine does not prevent *two plaintiffs*

7   from asserting separate copyright claims in a *single action*.  It is the opposite.  Claim splitting is a

8   species of claim preclusion, which prevents a *single* plaintiff from maintaining *two separate*

9   lawsuits involving the same subject matter, in order to avoid the preclusive effect of the first

10  action.  *See Cohen v. Trump*, 2014 U.S. Dist. LEXIS 23885, at *10 (S.D. Cal. Feb. 21, 2014)

11  ("Under the claim splitting doctrine, 'plaintiffs generally have no right to maintain *two separate*

12  *actions* involving the same subject matter at the same time in the same court and against the same

13  defendant.'") (emphasis added).  This is confirmed by *Zendel v. Circle Location Servs., Inc.,* 2012

14  WL 12876540, at *5 (C.D. Cal. Feb. 2, 2012), cited by uCool, which merely stated that "[c]laim

15  splitting is not a way around *res judicata*" (and denied the defendant's motion to dismiss).

16

17                                  **<u>CONCLUSION</u>**

18      For the foregoing reasons, uCool's Motion should be denied.

19  DATED: February 3, 2017               MITCHELL SILBERBERG &KNUPP LLP

20
                                         By:  /s/ Marc E. Mayer
21                                             Marc E. Mayer
                                               Attorneys for Plaintiffs
22

23

24

25

26

27

28