# MAYER DECLARATION

# EXHIBIT 2

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5    BLIZZARD ENTERTAINMENT, INC.,  )
      et al.,                        )
 6                                   )
                  Plaintiffs,        )
 7                                   )
          vs.                        ) Civil Action No.
 8                                   ) 15-cv-04084-CRB
      LILITH GAMES (SHANGHAI) CO.    )
 9    LTD. et al.,                   ) Volume I
                                     )
10                Defendants.        )
      _____)
11

12

13              - NON-CONFIDENTIAL PORTION -

14

15       VIDEOTAPED DEPOSITION OF STEVEN P. MESCON

16               Los Angeles, California

17             Friday, September 16, 2016

18

19

20

21

22

23

24    Reported by:  Marlene A. Duron
                    CSR No. 13333
25    NDS Job No.:  185330
```

                                                            1

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   BLIZZARD ENTERTAINMENT, INC.,  )
     et al.,                        )
 6                                  )
              Plaintiffs,           )
 7                                  )
        vs.                         )  Civil Action No.
 8                                  )  15-cv-04084-CRB
     LILITH GAMES (SHANGHAI) CO.    )
 9   LTD. et al.,                   )  Volume I
                                    )
10            Defendants.           )
     _____)
11

12

13

14

15        VIDEOTAPED DEPOSITION OF STEVEN P. MESCON,

16        taken on behalf of the Defendants at 12333

17        West Olympic Boulevard, Los Angeles,

18        California, beginning at 10:09 a.m. and ending

19        at 2:25 p.m., on Friday, September 16, 2016,

20        before Marlene A. Duron, Certified Shorthand

21        Reporter No. 13333.

22

23

24

25
                                                          2
```

```
 1    APPEARANCES:

 2

 3    For the Plaintiff:

 4         MITCHELL, SILBERBERG & KNUPP, LLP
           BY:  MARC E. MAYER, ESQ.
 5              DANIEL A. KOHLER, ESQ.
           11377 West Olympic Boulevard
 6         Los Angeles, California 90064
           (310) 312-2000
 7         Mem@msk.com
           dxk@msk.com
 8

 9    For the Defendant uCool, Inc.:

10         QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
           BY:  EVETTE D. PENNYPACKER, ESQ.
11              MICHAEL F. LaFOND, ESQ.
           555 Twin Dolphin Drive, Suite 560
12         Redwood City, California 94065
           (650) 801-5000
13         Evettepennypacker@quinnemanuel.com
           Michaellafond@quinnemanuel.com
14

15    For the Witness:

16         RIOT GAMES
           BY:  DAN D. NABEL, ESQ.
17         12333 West Olympic Boulevard
           Los Angeles, California 90064
18         dnabel@riotgames.com

19

20    Also present:

21         TONY BRUNO, The Videographer

22

23

24

25
                                                        3
```

```
 1                LOS ANGELES, CALIFORNIA;
 2         FRIDAY, SEPTEMBER 16, 2016, 10:09 A.M.
 3
 4            THE VIDEOGRAPHER:  Good morning.  This
 5   begins videotape one in the deposition of Steve      10:09:13
 6   Mescon, Volume I, in the matter of Blizzard
 7   Entertainment, Incorporated, et al. versus Lilith
 8   Games Shanghai Company, et al., in the United States
 9   District Court, Northern District of California,
10   civil action number 15-CV-04084-CRB.                 10:09:31
11            Today is September 16, 2016.  The time is
12   10:09 a.m.  Today's deposition is being held at
13   12333 West Olympic Boulevard, Los Angeles,
14   California.  My name is Tony Bruno, I'm a legal
15   videographer, here along with the court reporter,    10:09:53
16   Marlene Duron, on behalf of Network Deposition
17   Services.
18            Would counsel and all present please
19   introduce themselves for the record.
20            MS. PENNYPACKER:  Evette Pennypacker and    10:10:03
21   with me is Michael LaFond.  We're from Quinn Emanuel
22   and we're here on behalf of defendant uCool.
23            MR. MAYER:  Mark Mayer, with me is Daniel
24   Kohler, from Mitchell, Silberberg & Knupp, on behalf
25   of the plaintiffs Valve Corporation and Blizzard     10:10:16
```

```
 1   Entertainment.
 2          MR. NABEL:  Dan Nabel of Riot Games on
 3   behalf of Riot Games and the witness, Mr. Mescon.
 4          THE VIDEOGRAPHER:  Would you swear in the
 5   witness, please.                                    10:10:28
 6
 7                  STEVEN P. MESCON,
 8   having been first duly placed under oath, was
 9   examined and testified as follows:
10
11                    EXAMINATION
12   BY MS. PENNYPACKER:
13      Q   Good morning.  Can you please state your
14   name for the record.
15      A   Steven Patrick Mescon.                       10:10:41
16      Q   Thank you.
17          And do you go by any other names, such as
18   Pendragon?
19      A   Sure.  I go by Pendragon, yeah.
20      Q   Thank you for coming today.  My name is     10:10:49
21   Evette Pennypacker, as you heard when I gave my
22   announcement, and I'll be just asking you a series
23   of questions today.
24          The first thing I wanted to find out is,
25   have you gone through a deposition before?         10:11:04
```

7

```
 1        A    That's a fair characterization.  I don't
 2   know I would necessarily consider it a falling out,
 3   but I can see how it would be interpreted that way.
 4        Q    Maybe you can explain, in your own terms,
 5   what happened between you and IceFrog.              11:22:28
 6        A    I think that we both had different ideas
 7   about how games and game communities should work.
 8   And I ended up joining Riot and he ended up joining
 9   a number of other companies, and so we stopped
10   working together.  The detail -- like, the details  11:22:48
11   of what happened during that window, there's --
12   pretty extensive.
13        Q    Understand.
14             So what was your philosophy of the gaming
15   community?                                          11:23:01
16             MR. MAYER:  I'm going to object to the
17   extent it calls for a legal conclusion.
18             THE WITNESS:  Sure.  So, you know, my
19   philosophy is that we are making games for people,
20   and the more that we can involve and understand the 11:23:17
21   people who we're making games for, in the process,
22   the better the outcome will be for them.  And so I
23   think that -- I think that having a very close,
24   open, honest dialogue with players and allowing them
25   to kind of provide really extensive input in the    11:23:36
```

```
 1   creative process will yield a better product.  So --
 2   BY MS. PENNYPACKER:
 3       Q    Was that how you approached your work on
 4   DotA-Allstars?
 5       A    Yes.                                           11:23:48
 6       Q    And it was your view that IceFrog had a
 7   different approach to the work on DotA-Allstars?
 8       A    From my point of view, yes.
 9       Q    How was that different from your point of
10   view?                                                   11:24:00
11       A    From my point of view, I think that IceFrog
12   saw a sense of artistry in the making of a game and
13   that changed -- that changed his point of view of
14   how the relationship to players in the community
15   should manifest.                                        11:24:23
16       Q    I'm not -- I'm sorry.  I don't think I know
17   what you mean.  I don't think I'm smart enough.
18            So what did you -- what do you mean, a
19   sense of artistry --
20       A    Sure.                                          11:24:31
21       Q    -- in making a game?
22       A    Sure.  I -- you know, I felt like he really
23   knew that he knew what was best for people.  And in
24   my mind, he had it -- he had it in his mind that,
25   you know, it was -- it was almost a -- it was almost    11:24:50
```

67

```
 1       Q    Okay.  I'd like to -- I'd like you to take
 2  a look at Exhibit 21, which is the postmortem for
 3  Defense of the Ancients.
 4       A    Okay.
 5       Q    Okay.  So I'd like you to turn to -- you          13:58:12
 6  know what, I'm going to actually mark a different
 7  exhibit.  So let me withdraw that.
 8            Okay.  I have what I think is the same
 9  article but condensed a little bit.  I'm going to
10  mark this as Exhibit 34.                                    13:59:00
11            Is that what we're up to?  Okay.
12            (Deposition Exhibit 34 marked.)
13  BY MR. MAYER:
14       Q    Okay.  And Exhibit 34, you'll agree with
15  me, appears to be the same postmortem that we               13:59:34
16  previously marked as Exhibit 21, at least as to the
17  basic text of the article; is that fair to say?
18       A    Yes.
19       Q    And if you'll turn to I guess it would be
20  page 4 of 10 --                                             13:59:54
21       A    Okay.
22       Q    -- you'll see, number 5, it refers to
23  "small development and testing team."
24       A    Yes.
25       Q    Did you draft this portion, the text under       14:00:06
```

143

```
 1    paragraph 5 of page 4 of Exhibit 34?
 2        A    I mean, can you clarify "draft"?
 3        Q    Okay.  Did you write this section?
 4        A    The entire document was written in
 5    collaboration with Steve Feak.  Technically I did     14:00:34
 6    the typing.
 7        Q    Okay.
 8        A    All of the typing that went into the Word
 9    Editor, I did.
10        Q    So that was -- you typed this in, but it     14:00:48
11    reflects some input from Mr. Feak; is that correct?
12        A    Yes.
13        Q    And you'll see the last sentence -- I guess
14    it's the last sentence of page 4, it says:
15              "The entire development process            14:00:57
16          being controlled by a small group of
17          people also meant that the design team
18          maintained a completely unified vision."
19              Is it your understanding that the entire
20    development process was controlled by a small group   14:01:09
21    of people?
22        A    Yes.
23        Q    And that was a group of people that was led
24    by Guinsoo; is that correct?
25        A    Yes.                                         14:01:15
```

144

Steven P. Mescon                                                September 16, 2016

1      Q    Okay.  And to the best of your knowledge,
2  was Guinsoo the team leader?
3      A    Yes.
4      Q    And what does that mean to you, if -- to
5  refer to Guinsoo was the team leader?                14:01:29
6           MS. PENNYPACKER:  Objection; vague
7  foundation.
8           THE WITNESS:  It would be ultimate
9  accountability for the output of the team --
10 BY MR. MAYER:                                        14:01:37
11     Q    Okay.
12     A    -- which means everything from team
13 construction to process to roles and
14 responsibilities and ownership of quality and so on.
15     Q    To the best of your knowledge, did Guinsoo  14:01:48
16 have the ultimate authority to decide what went in
17 and didn't go into the game?
18          MS. PENNYPACKER:  Objection; foundation.
19          THE WITNESS:  During this period of time,
20 yeah.                                                14:02:00
21 BY MR. MAYER:
22     Q    Did you ever become aware or were you
23 aware, in or about 2005, that the DotA map file was
24 locked or couldn't be edited?
25     A    Yes.                                        14:02:11

                                                            145

1    Q    What was your understanding in that regard?
2    A    So there was a technical process that made
3    it more difficult for people to edit the map file
4    using Warcraft editor, but there are ways to
5    circumvent that process.  So --                       14:02:31
6    Q    To the best of your knowledge, was
7    DotA-Allstars locked during the period of time
8    Guinsoo was working on -- or was team leader for the
9    mod?
10   A    Yes.                                             14:02:41
11   Q    To the best of your knowledge, who had
12   control of the unlocked version of the file?
13   A    Steve Feak.
14   Q    Okay.  Now, if you'll turn to page -- I
15   guess it's the first page of Exhibit 34.  It's the   14:02:59
16   second paragraph.  You say, "Each new version of
17   DotA is the culmination" -- or I guess I should --
18   let me back up.
19        The article says, "Each new version of DotA
20   is the culmination of tens of thousands of man hours  14:03:18
21   of work by hundreds of community volunteers."
22        Do you make a distinction between the
23   hundreds of community volunteers and the small
24   development team?
25        MS. PENNYPACKER:  Objection; vague.              14:03:30

                                                            146

```
 1              THE WITNESS:  I would say there's a
 2   distinction.
 3   BY MR. MAYER:
 4       Q    What is that distinction?
 5       A    I guess direct versus indirect application    14:03:34
 6   of effort, I suppose.
 7       Q    So when you're referring to hundreds of
 8   community volunteers, those are people that gave
 9   suggestions and input; is that correct?
10       A    I -- it's a fair but incomplete              14:03:49
11   characterization, sure.
12       Q    Okay.  How would you complete the
13   characterization?
14       A    Yeah, I mean, the way people play the game
15   also defines how changes are made.  So I would       14:04:06
16   consider the behaviors that people exhibited when
17   playing to be more complete.  That's probably, I
18   think, the biggest thing that's missing.
19       Q    Okay.  But you're not talking about
20   hundreds of people actually coding the game; is that 14:04:20
21   correct?
22       A    Correct.
23       Q    And of those hundreds of community
24   volunteers, some of them may have made suggestions
25   that sort of worked their way into the game and some 14:04:29
```

147

```
 1                PENALTY OF PERJURY CERTIFICATE

 2

 3        I hereby declare I am the witness in the within

 4   matter, that I have read the foregoing transcript and

 5   know the contents thereof; that I declare that the same

 6   is true to my knowledge, except as to the matters which

 7   are therein stated upon my information or belief, and as

 8   to those matters, I believe them to be true.

 9        I declare being aware of the penalties of perjury,

10   that the foregoing answers are true and correct.

11

12

13

14

15        Executed on the _____ day of _____, ____,

16   at _____, _____.

17               (CITY)                    (STATE)

18

19

20

21             _____

22                         STEVEN P. MESCON

23

24

25
```

173

```
1    STATE OF CALIFORNIA        )
                                ) ss:
2    COUNTY OF LOS ANGELES      )

3

4           I, MARLENE A. DURON, do hereby certify:

5           That I am a duly qualified Certified Shorthand

6    Reporter, in and for the State of California, holder of

7    certificate number 13333, which is in full force and

8    effect and that I am authorized to administer oaths and

9    affirmations;

10          That the foregoing deposition testimony of the

11   herein named witness was taken before me at the time and

12   place herein set forth;

13          That prior to being examined, the witness named

14   in the foregoing deposition, was duly sworn or affirmed

15   by me, to testify the truth, the whole truth, and

16   nothing but the truth;

17          That the testimony of the witness and all

18   objections made at the time of the examination were

19   recorded stenographically by me, and were thereafter

20   transcribed under my direction and supervision;

21          That the foregoing pages contain a full, true

22   and accurate record of the proceedings and testimony to

23   the best of my skill and ability;

24          That prior to the completion of the foregoing

25   deposition, review of the transcript was requested.
```

174