1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BLIZZARD ENTERTAINMENT, INC., AND
VALVE CORPORATION,

        Plaintiffs,

  v.

LILITH GAMES (SHANGHAI) CO. LTD.,
AND UCOOL, INC.,

        Defendants.
_____/

No. 3:15-cv-04084-CRB

**ORDER DENYING MOTION FOR
PARTIAL SUMMARY JUDGMENT AND
DENYING MOTION FOR RULE 11
SANCTIONS**

      The various video games at issue in this copyright case take players to fantastical

worlds populated by elves, demons, and at least one elf-demon.[1]  The earliest of these games,

Plaintiff Blizzard Entertainment's "Warcraft III: Reign of Chaos," lets them build their own

fantastical worlds populated by custom characters.  Playing off the word modification,

players call this process "modding" and their modding creations "mods."

      Eventually, this rather remarkable chance to play God, like too many human

endeavors, devolved into a fight over money.  In the early 2000s, a particular Warcraft III

mod called "DotA" (short for "Defense of the Ancients") took the gaming community by

storm.  Companies took notice.  In 2013, Plaintiff Valve Corporation released a stand-alone

---

[1]  See "Illidan Stormrage" (dkt. 36–1) at 6.

**United States District Court**
For the Northern District of California

game modeled on DotA called "Dota 2," which also took the gaming community by storm.[2]
Still more companies took notice.  Defendants Lilith Games and uCool, Inc. released their
own iterations—"DotA Legends" and "Heroes Charge," respectively—built specially for
smart phones.  Blizzard and Valve, who themselves settled copyright disputes between them,
are now suing Lilith and uCool.  uCool has moved for partial summary judgment against
Valve, arguing that Valve does not own copyrights in the original DotA and subsequent
mods, and thus has no viable copyright claims against uCool.

I.     **BACKGROUND**

A.     **Statutory Framework**

Under the Copyright Act of 1976, copyright protects "original works of authorship
fixed in any tangible medium of expression," like books and paintings.  17 U.S.C. § 102.  It
also protects "audiovisual works," like movies and video games.  Id.; Micro Star v. Formgen
Inc., 154 F.3d 1107, 1109–10 (9th Cir. 1998).  A work is "created" when it is "fixed."
17 U.S.C. § 101.  When a work is created "over a period of time, the portion of it that has
been fixed at any particular time constitutes the work as of that time."  Id.  And when it "has
been prepared in different versions, each version constitutes a separate work."  Id.  The
owner of a copyright has the exclusive right to, among other things, "reproduce" and
"distribute" their works.  Id. §§ 106(1), (3).

Copyright "vests initially in the author or authors of" a work.  Id. § 201(a).  But being
an "author" requires more than making a creative contribution, even a "valuable and
copyrightable" one.  Aalmuhammed v. Lee, 202 F.3d 1227, 1232 (9th Cir. 1999).  An author
must have "superintended the whole work," acting as a "master mind" with "creative
control."  Id. at 1233 (quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 61
(1884)).  When two or more people superintend a work and intend that their contributions
will "be merged into inseparable or interdependent parts of a unitary whole"—like a novel or
song—they have authored a "joint work."  17 U.S.C. § 101; Aalmuhammed, 202 F.3d at
1232.  Joint authors are joint owners of the copyright in a joint work, 17 U.S.C. § 201(a), and

---

[2]  For one reason or another, Valve dropped the capital "A" in DotA.

so may "sue third-party infringers without joining [their] fellow co-owners." Corbello v. DeVito, 777 F.3d 1058, 1065–66 (9th Cir. 2015).

By contrast, when a person superintends the assembly of a number of "separate and independent works" into "a collective whole"—like a magazine or encyclopedia—he or she has authored a "collective work."  17 U.S.C. § 101.  The author of a collective work holds copyright "in the collective work as a whole," but "is presumed to have acquired only the privilege of reproducing and distributing" the contributions that make up the collection.  Id. § 201(c).  The authors of contributions retain those copyrights.  See id. § 201(c); § 103(b) ("The copyright in a compilation . . . extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work."); id. § 101 ("The term 'compilation' includes collective works.").

A work that is "based upon one or more preexisting works" is a "derivative work," id. § 101, if it "substantially incorporate[s] protected material from the preexisting work," Micro Star, 154 F.3d at 1111; see also 17 U.S.C. § 101 (noting that a derivative work may consist of "editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship").  The owner of a copyright "has the exclusive right" to "prepare derivative works based upon the copyrighted work" or authorize others to do the same.  Id. § 106(2).  Copyright in a derivative work protects "the material contributed by the author" of a derivative work, provided that it does not "affect or enlarge" copyright protection of the preexisting material.  Id. § 103(b).  Copyright in a derivative work "does not imply any exclusive right in the preexisting material," id., nor does it "extend to any part of the work in which [preexisting] material has been used unlawfully," id. § 103(a).

A work "prepared by an employee within the scope of his or her employment" is a "work made for hire."  Id. § 101.  Parties may agree to treat a work as one made for hire, so long as they do so in writing.  Id.  Either way, "the employer or other person for whom the work was prepared is considered the author," unless otherwise agreed.  Id. § 201(b).

Like most assets, "ownership of a copyright may be transferred in whole or in part by any means of conveyance."[3]  Id. § 201(d)(1).  Any copyright transfer must be made in writing, id. § 204(a), except for a nonexclusive license, id. § 101, which may be granted orally or implied by conduct, Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990).  Copyright may also be abandoned if the owner performs "some overt act indicating an intention to abandon."  Micro Star, 154 F.3d at 1114.  Abandonment, like a transfer, may be made in whole or in part.  See id.

Registration with the Copyright Office is not necessary to own a valid copyright, 17 U.S.C. § 408(a), but it does create a presumption of ownership if made within five years after first publication.[4]  17 U.S.C. § 410(c).

**B.    Factual Background**

This story is far from linear, but the Court will try to make sense of the sprawl.[5]  And as it confronts a motion for partial summary judgment, the following facts cast the record in the light most favorable to the non-moving party, Valve.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**1.    Warcraft III**

In 2002, Blizzard released "Warcraft III: Reign of Chaos," what was then the latest installment in its popular fantasy franchise.  Like its predecessors, Warcraft III was a computer strategy game.  Eul Decl. ¶ 2.  Players controlled armies made up of humans, orcs, elves, and zombies fighting for dominance over the fictional, computer-generated world of Azeroth.  Id. ¶ 2.  To aid in the quest, Warcraft III armies came not just with standard soldiers but also "heroes," special warriors that grew more and more powerful with more and more game play.  Id. ¶¶ 2–3.

---

[3] They may also be transferred "by operation of law," "bequeathed by will," or "pass as personal property by the applicable laws of intestate succession." 17 U.S.C. § 201(d)(1).

[4] Filing a copyright registration application is also a prerequisite to filing suit.  See 17 U.S.C. § 411(a); S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1085 (9th Cir. 1989).

[5] Although the parties stipulated to a protective order in this case, the Court sees no need for redactions here.  See Kamakana v. City and Cnty. of Honolulu, 447 F.3d 1172, 1179–80 (9th Cir. 2006).

United States District Court
For the Northern District of California

But fantasy afficionados had reason to rejoice besides their new ability to hone a hero into a force to be reckoned with.  Warcraft III also included a program called the "World Editor," which enabled players to create new settings, characters, storylines, and rules—and then share them online with the gaming community.  Id. ¶¶ 4, 6; see also Micro Star, 154 F.3d at 1110 (discussing similar program available with another video game, "Duke Nukem 3D").  Other players could then choose from a list of these "mods" (also called "maps"), download them, and join the custom-designed fray.  Eul Decl.  ¶ 6.  They could even take an existing mod and make further changes themselves.  See Guinsoo Depo. 17:4–10.  The catch was that mods could not stand alone; players needed a copy of Warcraft III to build or play them.  Eul Decl. ¶ 6.

Despite affording players formidable tools for creative expression, Blizzard did not ensure that Warcraft III's End User License Agreements ("EULAs") assigned intellectual property created using the World Editor back to the company.[6]  See EULAs (dkts. 120–8 & 120–9).  The EULAs did, however, make clear that players could not "use or allow third parties to use the [World Editor or mods] created thereby for commercial purposes including, but not limited to, distribution of [mods] on a stand-alone basis or packaged with other software or hardware through any and all distribution channels, including, but not limited to, retail sales and on-line electronic distribution without the express written consent of Blizzard."  Id. ¶ 3.C.iii.  Mods were for play, not pay.

### 2.  DotA

Some mods proved more contagious than others.  A high-school student named Kyle Sommer, operating under (and hereinafter referred to by) his online moniker "Eul," was Patient Zero for one of the most infectious: "Defense of the Ancients" a/k/a "DotA."  His mod pitted two teams of heroes against one another, each trying to destroy the other's "central structure" while defending one's own.  Eul Decl. ¶ 8. Eul conceived of DotA's

---

[6] Blizzard learned its lesson.  See New EULA (dkt. 120–32) ¶ 2.

United States District Court
For the Northern District of California

setting, heroes, rules, and name—and then built them using the World Editor in late 2002. Eul Depo. at 46:19–50:7. A video game called "Diablo II" and a card game called "Magic: The Gathering" inspired many of Eul's heroes, while another video game called "Aeon of Strife" inspired DotA's rules. Id. at 55:11–56:4. Eul continued working on DotA for roughly two years, adding, subtracting and changing heroes and their powers in subsequent versions. Id. at 62:1–4. He also changed many other game elements. Id. at 62:4–7. In an attempt to retain control over the process, Eul "locked" his mod, meaning that he deliberately corrupted DotA's code to stop others from building directly off of it (though copycat versions appeared just the same). Guinsoo Depo. at 18:6–20:6; id. at 33:8–36:1.

By late 2004, Eul wanted to go to college and didn't have time to continue updating DotA. Eul Depo. at 53:3–8. On September 23 of that year, he posted on a gaming community web forum, declaring that "from this point forward, DotA is now open source. Whoever wishes to release a version of DotA may without my consent, I just ask for a nod in the credits to your map." Eul Online Post (dkt. 120–17); see also Eul Depo. at 59:16–60:8; id. at 64:2–67:18. The eighteen-year-old Eul then moved on to other things.[7] Eul. Depo. at 60:3–11. Despite believing that he owned what he had created, and despite knowing that other players were building their own versions of DotA, Eul does not remember trying to register a copyright. Id. at 68:8–69:24.

### 3. DotA Allstars

Different strains of DotA quickly grew out of Eul's original mod—well before he open-sourced it. See Eul Depo. at 69:12–24; Guinsoo Depo. at 18:2–20:13. Much of this case concerns a super-strain of DotA called DotA Allstars.

---

[7] At his deposition, Eul testified that he "wanted the community to continue updating DotA" and use his code, so "long as they weren't taking credit for" creating the game. Eul Depo. at 65:5–66:12. He also referred to the post as a "license." Id.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

### a.      Meian & Madcow

At some point in 2003, two still-unidentified players who called themselves "Meian" and "Madcow" took what they thought were "the best, most enjoyable characters from all the other version of DotA and put them in one" mod.  Guinsoo Depo. at 14:24–15:1, 18:23–19:18.  They called it DotA Allstars.  Id.  Meian and Madcow's mod was not locked like Eul's, so anyone could build off of their code.  Id. at 17:4–10, 33:8–34.  That feature allowed Stephen Feak, a/k/a "Guinsoo," to transform DotA Allstars into a DotA super-strain.

### b.      Guinsoo

In late 2003, Guinsoo started building off one of Meian and Madcow's unlocked versions of DotA Allstars.  Guinsoo Depo. at 14:24–15:1; id. at 18:23–19:18.  Guinsoo picked this mod as a base because it was "the most stable" and "the most played version at the time."  Id. at 30:19–20.  He looked at lists of customs games, figured out which one the most people were playing, and ran with it.  Id. at 30:22–31:6.  Guinsoo did not tell Meian and Madcow what he was doing.  Id. at 41:4–8.

Early on, Guinsoo simply hoped fix problems and "polish" DotA Allstars by, for example, ensuring that heroes were evenly matched.  Id. at 28:23–29:20.  It was only after he finished "fixing the really low hang[ing] fruit," that he transitioned to expanding the mod's content.  Id. at 29:16–30:9; see also id. at 213:15–215:10.  Unlike Eul, Guinsoo welcomed input from others, friends and strangers alike.  Id. at 41:16–43:20.  Contributors had varying levels of input.  Some, like Stephen Moss a/k/a "Neichus" and the still-unidentified players "Syl-la-ble" and "Zetta," were in a top tier that contributed "really heavy design" work and actual programming; they also helped Guinsoo with "intimate decision-making" about the broader vision for DotA Allstars.  Id. at 46:18–48:12; Neichus Depo. at 23:16–21.  Others, such as Derek Baker a/k/a "Terrorblaze," were in a tier below that pitched detailed ideas to Guinsoo and sometimes helped make them a reality.  For example, Terrorblaze and Guinsoo did "a hand-in-hand design" of a character called "Terrorblade," which Guinsoo—as the mod "authority"—then chose to include.  Guinsoo Depo. at 49:9–50:18.  People in the bottom tier

28

7

**United States District Court**
For the Northern District of California

1   posted ideas on public forums that Guinsoo read, or gave him direct feedback about what

2   was good or bad about existing versions, but left it at that.  Id. at 53:3–54:16.

3        Throughout this process Guinsoo considered himself a "chieftain" of sorts.  Id. at

4   85:7.  Others held him in similarly high esteem.  See Neichus Depo. at 22:25–23:3; id. at

5   45:22–47:13; Terrorblaze Depo. at 87:18–88:8.  Guinsoo gave credit to his helpers but

6   controlled what made it into the mod and what did not—and he kept it locked.  Guinsoo

7   Depo. at 41:13–43:24; id. at 198:9–199:23.

8        By early 2005, Guinsoo had shepherded DotA Allstars from version 2.0 to 6.0,

9   iterations that added some 40 new heroes, wrought substantial changes to other game

10   elements, and rewrote a majority of the code.  Id. at 207:16–210:3; id. at 235:19–236:24.  He

11   then called it quits.  But rather than open-source DotA Allstars, Guinsoo gave Neichus an

12   unlocked version so that he could keep developing what was fast becoming the dominant line

13   of DotA mods.  See id. at 218:16–219:21; Neichus Depo. at 100:1–9.

14                    **c.    Icefrog**

15        Neichus promptly enlisted Abdul Ismail a/k/a "Icefrog" to work "work jointly as

16   developers of DotA Allstars."  Icefrog Depo. at 25:19–28:6.  Icefrog had done some work on

17   DotA Allstars while Guinsoo was the lead developer, Neichus Depo. at 58:13–15, and also

18   had "much greater skills and training in programming" than Neichus,[8] id. at 57:2–16.

19   Although Guinsoo "hadn't really considered" Icefrog taking on a leadership role, he

20   knew—indeed hoped—that subsequent modders would keep DotA Allstars alive.  Guinsoo

21   Depo. at 219:6–220:12.  Icefrog therefore had his "blessing" to continue developing the mod.

22   Icefrog Depo. at 248:7–249:4.

23        Before long, DotA Allstars's increasing popularity "scared" Neichus and made

24   working on the mod feel "more like a job" than a hobby, so he stopped.  Neichus Depo. at

25   99:22–100:9.  Icefrog then became the sole lead developer.  Icefrog Depo. at 25:17–26:9.

26   _____

27        [8]  Neichus nevertheless insists that he was the sole lead developer for a brief period and that
     Icefrog was his "right-hand man" during that time.  Neichus Depo. at 55:9–57:17.

28                                    8

United States District Court
For the Northern District of California

Much like Guinsoo before him, Icefrog took suggestions from others and decided what elements made it into the mod and what elements did not. Id. at 34:7–43:18. And like Guinsoo, Icefrog often credited those whose suggestions made the cut. Id. at 45:24–46:2. But while Guinsoo's oversight had been somewhat informal, Icefrog regularly enlisted a team of helpers. See Terrorblaze Depo. at 96:12–99:6.

At some point in early 2006, Marc DeForest, the founder of a company called S2 Games ("S2"), contacted Icefrog online.[9] Icefrog Depo. at 76:21–77:2. DeForest was a fan of DotA Allstars, id. at 77:20–22, and eventually convinced Icefrog to join S2 as a designer, id. at 75:4–9. While there, Icefrog mainly worked on a game called "Heroes of Newerth." Id. at 132:3–134:15. Initially, Icefrog's employment agreement gave him all intellectual property rights "created in connection" with Heroes of Newerth, but was later revised to grant S2 those rights. See 2006 S2 Agreement (dkt. 120–29) ¶ 5; Icefrog Depo. at 125:25–129:8. Icefrog also agreed from the get-go to "continually update DotA Allstars and its associated websites so as to maintain the current player base."[10] Id. at 122:15–23. Because DotA Allstars inspired Heroes of Newerth's game play, S2 looked to capitalize on continued interest in DotA Allstars. See id. at 133:16–134:20.

### 4.     Dota 2

In 2009, Valve began developing Dota 2, a stand-alone computer game based on DotA and DotA Allstars. Lynch Depo. at 144:23–145:12. That same year, Valve hired Icefrog as a developer. On May 24, 2010, Icefrog assigned any and all of his rights in DotA and DotA Allstars to Valve for a handsome price. See Icefrog Assignment (dkt. 120–10) at 1, 3. Four months later, Eul did the same with this rights in DotA and then took a job at Valve. See Eul Assignment (dkt. 120–11) at 1–3; Eul Depo. at 39:6–8.

---

[9]   S2 is not a party in this case.

[10]   Icefrog agreed to advertise Heroes of Newerth on the website "dota-allstars.com" and made his own arrangements with the site manager, Steve Mescon (a/k/a "Pendragon"), to ensure that he could fulfill that obligation. See Icefrog Depo. at 85:3–89:3.

United States District Court
For the Northern District of California

1   Guinsoo, for his part, left full-time modding to work for Riot Games.  Guinsoo Depo.

2   at 98:3–11.  While at Riot, Guinsoo worked on "League of Legends," yet another game tied

3   (at least loosely) to the Warcraft III/DotA universe.[11]  Id. at 98:3–14.  For a price, Guinsoo

4   assigned any and all of his rights in DotA and DotA Allstars to Riot.  Guinsoo Depo. at

5   100:9–101:5.  Riot then transferred those rights to Blizzard in September 2011.

6   See Riot/Blizzard Settlement (dkt. 120–7) at 1–2.

7   Valve, at long last, released Dota 2 in July 2013.[12]

8   **5.      DotA Legends & Heroes Charge**

9   As any millennial could tell you, players no longer need a computer or console to

10   enjoy video games.  The market for video games built specially for smart phones has

11   exploded in recent years.  uCool and Lilith, based in Menlo Park and Shanghai respectively,

12   have taken advantage of that trend.  In February 2014, Lilith released a smart-phone game

13   based on the DotA universe called "DotA Legends."[13]  See Lilith Games v. uCool, Inc. et al.,

14   case no. 3:15-cv-01267, Order (dkt. 117) at 2 & n.2.  Six months later, uCool released its

15   own such game, "Heroes Charge."[14]  Id. at 2.  Blizzard and Valve sued, alleging that both

16   DotA Legends and Heroes Charge infringe their copyrights DotA, DotA Allstars, and Dota 2.

17   **C.      Procedural History**

18   The Court dismissed Blizzard's and Valve's original complaint for failure to state a

19   claim because it needed "additional detail."  Order on FMTD (dkt. 35) at 11.  After Blizzard

20   and Valve filed an amended complaint ("FAC"), uCool again moved to dismiss, this time

21   largely on the grounds that neither Blizzard nor Valve had adequately pled ownership of the

22   

23   [11]   Riot is not a party in this case.

24   [12]   Neichus assigned his rights to Blizzard and Valve in July 2016.  See Neichus Assignment
(dkt. 120–13).

25   

26   [13]   The English-language version of DotA Legends is called "Dot Arena."

27   [14]   At one point Lilith sued uCool for copyright infringement, though that case never made it to
final judgment.  See Lilith Games v. uCool, Inc. et al., case no. 15-cv-01267 (LHK).

28

United States District Court
For the Northern District of California

1  original DotA.[15]  See SMTD (dkt. 44) at 1.  The Court denied the motion from the bench,

2  finding that the ownership issue would be best resolved on a motion for partial summary

3  judgment following limited discovery.  See H'rg Tr. on SMTD (dkt. 76) at 11:6–20.  That

4  motion is now before the Court, though this time uCool has moved as to Valve alone.[16]

5  After reviewing the parties' submissions, the Court ordered further briefing on how, if

6  at all, Warcraft III's ban on using mods for commercial purposes affected uCool's motion.

7  See Order (dkt. 147) at 1.  uCool responded flatly that "it does not."  uCool Supp. Br. at 1.

8  Valve agreed.  See Valve Supp. Br. (dkt. 152) at 1.

9  The Court also deferred consideration of uCool's motion for Rule 11 sanctions.  See

10  Order Deferring Consideration (dkt. 136).  uCool asked the Court to sanction Valve for

11  allegedly (i) making false statements in its FAC, (ii) making false statements in its opposition

12  to uCool's motion to dismiss its FAC, (iii) failing to drop or amend their claims after learning

13  of supposed defects in its FAC, and (iv) failing to disclose relevant documents in discovery.

14  See R.11 Mot. (dkt. 126) at 2.

15  And here we are.

16  **II.    LEGAL STANDARD**

17  Partial summary judgment allows for the prompt disposition of specific claims or

18  defenses.  The Court may grant a motion for partial summary judgment "if the movant shows

19  that there is no genuine dispute as to any material fact and the movant is entitled to judgment

20  as a matter of law."  Fed. R. Civ. P. 56(a).  A principal purpose of partial summary judgment

21  "is to isolate and dispose of factually unsupported claims."  Celotex Corp. v. Catrett, 477

22  U.S. 317, 323–24 (1986).  A dispute is genuine if the admissible evidence on the record "is

23  such that a reasonable jury could return a verdict" for either party.  Anderson v. Liberty

24  Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material if it could affect the outcome of the

25

26  [15]  Lilith did not join either motion to dismiss.

27  [16]  Lilith, yet again, did not join the motion.

28  11

suit under the governing law.  Id. at 248–49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).  To determine whether a genuine dispute as to any material fact exists, the Court must view the evidence in the light most favorable to the non-moving party.  Id. at 255.

## III.    DISCUSSION

Although Valve maintains that Dota 2 itself contains original, copyrightable expression, see Opp'n at 8, much of this case hinges on whether Valve and Blizzard acquired copyrights in DotA and DotA Allstars from Eul, Guinsoo, and Icefrog,[17] id. at 1–2.  That in turn depends on (A) the scope of the copyrights that Eul, Guinsoo, and Icefrog originally possessed, and (B) whether they validly assigned those copyrights to Valve and Blizzard.[18]

### A.    Scope of the Copyrights

With literally hundreds of versions of DotA and DotA Allstars floating around in the ether, the Court confronts quite the copyright conundrum.  To sort through things, it must first determine just what, exactly, is the work(s) at issue here.  Second, it must determine who is the relevant author(s).  Third and finally, the Court will consider just what result(s) flows from the answers to those questions.

---

[17]  Valve maintains that its claims do not depend on having validly acquired Neichus's rights.  See Opp'n at 8 n.4.  Valve is only partially correct.  Because every version of DotA or DotA Allstars is a separate "work" under the Copyright Act, see Part III.A.1, Valve may not recover for copyright infringement of any version authored solely by Neichus without a valid assignment.  A reasonable jury, however, could conclude that Neichus was at all times a joint author with Icefrog, and that Icefrog's assignment to Valve was indeed valid.  Valve therefore may sue on any version of DotA Allstars that Neichus might have authored on his own, with or without a valid assignment from Neichus, and whether or not it ultimately prevails.  In any event, this is not a case where a party has offered a post-hoc assignment to cure a lack of Article III standing, see MPSJ at 19 (citing Minden Pictures, Inc. v. John Wiley & Sons, Inc., case no. 12-cv-4601 (EMC), 2013 WL 1995208 at *8–*9 (N.D. Cal May 13, 2013)), so the Court need not throw out Neichus's assignments to Valve and Blizzard for that reason.

[18]  Valve has represented that copyrights of both Warcraft III and Dota 2 were timely registered with the Copyright Office.  See Opp'n at 11.  Valve and Blizzard also registered copyrights in several versions of DotA and DotA Allstars in February 2016.  See Copyright Registrations for Dota 6.83 (dkt. 55–4), DotA Beta 2 (dkt. 55–5) & DotA 6.68 (dkt. 55–7).  It appears that no other versions of either mod were registered, so no statutory presumption of ownership applies.  See 17 U.S.C. § 410(c).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

### 1.     Work(s)

The statute is clear: "[W]here the work is prepared in different versions, each version constitutes a separate work." 17 U.S.C. § 101. That provision alone dooms any suggestion that various versions of DotA and DotA Allstars make up a single joint work under the Copyright Act.[19] Instead, individual versions of DotA or DotA Allstars (and of other related mods, like "DotA Darkness Falls") are separate works.

Each individual version is also a unitary work. Movies, for example, almost always make up a "unitary whole" with "inseparable and interdependent parts," 17 U.S.C. § 101, because the direction, acting performances, cinematography, costume design, and all the rest merge into one integrated work, see Richlin v. Metro-Goldwyn-Mayer Pictures, Inc., 531 F.3d 962, 975 (9th Cir. 2007) ("A motion picture is a work to which many contribute; however, those contributions ultimately merge to create a unitary whole."); accord Aalmuhammed, 202 F.3d at 1233 (describing movie as an "inseparable whole"). So too with video games. See Micro Star, 154 F.3d at 1112.

uCool counters that DotA Allstars is a collective work because Guinsoo and Icefrog—and Meian and Madcow before them—took the most popular DotA heroes and arranged them into a new game. See MPSJ at 17. But by that logic Star Wars: The Force Awakens (Walt Disney Studios 2015) would be a collective work because it arranged the most popular Star Wars heroes, settings, and one-liners into a new movie. The same might be said of Love Actually (Universal Pictures 2003), given its all-star cast and web of different storylines. But Castaway (20th Century Fox 2000), with its solitary protagonist and

---

[19]    Valve argues that Eul, Guinsoo, and Icefrog were joint authors of a single joint work comprised of their respective versions of DotA and DotA Allstars. See Opp'n at 11–15. If that were true, Valve could indeed recover for infringement of that entire work. See Corbello, 777 F.3d at 1065–66. This theory in no way requires Valve to assert rights it does not purport to own, so uCool's arguments that Valve lacks standing and/or has contravened the doctrine against claim-splitting are puzzling. Valve's joint-work theory, as noted above, does not work. Even putting aside the Copyright Act's "separate versions" provision, Valve would be hard-pressed to argue that, say, Guinsoo and Eul intended to be joint authors. See Aalmuhammed, 202 F.3d at 1235. Guinsoo worked off of Meian's and Madcow's DotA Allstars—not Eul's DotA—and started before Eul open-sourced his mod. Still, this reality might affect the value of the copyrights Valve purports to own, but ought else.

13

United States District Court
For the Northern District of California

1    even more solitary plot, would presumably be a unitary work.

2         None of this can be right, and the Copyright Act does not suggest otherwise.[20]  The

3    statute gives "a periodical issue, anthology, or encyclopedia" as examples of collective

4    works.  17 U.S.C. § 101.  So someone who, say, downloaded the most popular versions of

5    DotA onto CDs and packaged them as "DotA Hits of the Early 2000s," would have created a

6    collective work, provided that the endeavor "entail[ed] a minimal degree of creativity," Feist

7    Pub., Inc. v. Rural Telephone Service Co., 499 U.S. 340, 38 (1991).  But DotA Allstars is

8    nothing like that, nor is it anything like The New Yorker, The Beatles Anthology, or

9    Encyclopedia Britannica.  Heroes do battle in teams on fictional battlefields—together.  They

10   do not stand alone in self-contained bubbles.  So like Star Wars: The Force Awakens and

11   Love Actually, each version of DotA Allstars is no collective work.  To the contrary, each

12   version is a unitary derivative work based on earlier versions DotA and DotA Allstars.[21]  See

13   Jarvis v. K2 Inc., 486 F.3d 526, 531–32 & n.6 (9th Cir. 2007) (holding that collage

14   advertisements were unitary derivative works, not collective works, because the defendant

15   "fused" photographs "with other images and artistic elements into new works that were based

16   on" the plaintiff's original photographs).  Individual versions of DotA and DotA Allstars,

17   then, are the "works" at issue here.[22]

18

19

20   _____

21        [20] At the hearing on May 12, 2017, uCool appeared to maintain that DotA was a collective work
     as well.  That argument falls all the flatter.

22
          [21] Dota 2 is derivative of these works, while Eul's first version of DotA is itself derivative of
23   (in some order) Diablo II, Magic: The Gathering, Aeon of Strife, and Warcraft III.

24        [22] For this reason, In re Napster, Inc. Copyright Litigation, 191 F. Supp. 2d 1087 (N.D. Cal.
     2002), does not help uCool.  In re Napster concerned, well, Napster—a website that allowed users to
25   download music for free.  There, the plaintiff record companies had to show "chain of title" for
     individual songs because individual songs were the works at issue.  See id. at 1101.  Here, Valve need
26   only show "chain of title" for individual versions of DotA and DotA Allstars because individual
     versions—not individual heroes—are the works at issue.  A reasonable jury could conclude that Valve
27   has made that showing for numerous versions of DotA and DotA Allstars.  See Part III.B.

28                                                  14

United States District Court
For the Northern District of California

### 2.     Author(s)

The question remains: who were the "authors" of these works?  For many versions of DotA and DotA Allstars, we might never know.  But for plenty of others, we do: Eul (born Kyle Sommer), Guinsoo (born Stephen Feak), and Icefrog (born Abdul Ismail).[23]

An author is the "master mind" behind a work—the person with "creative control." Aalmuhammed, 202 F.3d at 1233 (citing Burrow-Giles, 111 U.S. at 61).  Someone who makes a creative contribution, however valuable, is not.  See id. at 1232.  Consider Aalmuhammed v. Lee, 202 F.3d 1227 (9th Cir. 2000).  There the plaintiff, Aalmuhammed, "rewrote several specific passages of dialogue that appeared" in the movie Malcolm X (Warner Bros. 1992) and even "wrote scenes relating to Malcolm X's Hajj pilgrimage that were enacted in the movie."  Id. at 1231.  Even though he was an author of these particular scenes,[24] Aalmuhammed was not an author of the movie.  Id. at 1231–32.  That was Director Spike Lee alone.  Id. at 1235.  The Ninth Circuit reasoned that, although Aalmuhammed made "extremely helpful recommendations," Spike Lee "was not bound to accept any of them, and the work would not benefit in the slightest unless" he did.  Id.  Aalmuhammed was no mastermind, and therefore no author.

The record contains ample evidence that Eul, Guinsoo, and Icefrog were the masterminds behind their respective versions of DotA and DotA Allstars.  uCool concedes as much with respect to Eul, admitting that he "created the [mod], the characters, their abilities and themes, the rules, and named the game."  MPSJ at 12–13.  Guinsoo and Icefrog are no different, legally speaking.  They, like Spike Lee, took suggestions from others—some

---

[23]   Again, Neichus (born Stephen Moss) might also qualify for a few versions, though a reasonable jury could conclude the he was at all times a joint author with Icefrog.

[24]   The Ninth Circuit observed that these pieces were "independently copyrightable," a notion later undercut by Garcia v. Google, 786 F.3d 733 (9th Cir. 2015) (en banc).  See id. at 743 ("Treating every acting performance as an independent work would not only be a logistical and financial nightmare, it would turn cast of thousands into a new mantra: copyright of thousands"); accord 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 256–59 (2d Cir. 2016) ("[I]nseparable contributions integrated into a single work cannot separately obtain [copyright] protection.").

United States District Court
For the Northern District of California

elaborate, some less so—and decided which ones made the cut.  So just as Spike Lee was the author of the work at issue in <u>Aalmuhammed</u>, a reasonable jury could (and perhaps must) conclude that Eul, Guinsoo, and Icefrog are the authors of the various works at issue here.

### 3.    Result(s)

Under the Copyright Act, numerous versions of DotA and DotA Allstars are unitary "works" that were "authored" by Eul, Guinsoo, or Icefrog.[25]  Both parties at times acknowledge as much.  <u>See</u> Opp'n at 15 n.8 ("At <u>minimum</u>, Eul, Guinsoo, and Icefrog are authors of all of their more than 200 cumulative versions of DotA.");  Reply at 6 ("DotA is not a single work, it is multiple works, created by multiple people who controlled, at most, distinct versions, over the course of nearly a decade.").  So assuming Valve validly acquired Eul's and Icefrog's rights, uCool's motion for summary judgment fails to the extent it maintains, "Valve did not create, and does not independently own, the underlying work from the original DotA that is reused in Dota 2."  MPSJ at vi (first issue).  But uCool does not stop there.  It also argues that Valve must demonstrate ownership of particular heroes and other visual elements in DotA and DotA Allstars—separate and apart from ownership of various versions of those mods.  <u>See</u> MPSJ at iv (second set of issues).  uCool is mistaken.

Granted, Valve had to point to specific examples of infringement to plausibly allege that uCool copied Dota 2.  <u>See</u> Order on FMTD at 11; <u>Cavalier v. Random House, Inc.</u>, 297 F.3d 815, 822 (9th Cir. 2002) ("To establish a successful copyright infringement claim, a plaintiff must show that he or she owns the copyright and that [the] defendant copied protected elements of the work.").  And it will need to do the same to make an effective case at trial.  But that evidentiary necessity does not chop up Valve's purported copyrights in various versions of DotA and DotA Allstars.  Consider a twist on <u>Aalmuhammed</u>:

---

[25]  As for remaining versions, those too are unitary "works" with discrete "authors," namely the earliest versions of DotA Allstars (authored by Meian and Madcow), several later versions of DotA Allstars (authored by Neichus, though arguably jointly with Icefrog), and various versions of other DotA mods (authored by Lord knows who).  That some creative expression in Dota 2 originated in these versions goes to the value of the copyrights that Valve claims to own, not whether it in fact owns them.

United States District Court
For the Northern District of California

Spike Lee assigns his copyright in Malcolm X to, let's say, Warner Brothers.  Disney comes along and makes a cartoon version of the movie called Malcolm ABC.  Warner Brothers sues, claiming Malcolm ABC infringes its copyright in Malcolm X.  Disney responds that Aalmuhammed, not Spike Lee, wrote the scene chronicling the protagonist's Hajj pilgrimage, which appears in both Malcolm X and Malcolm ABC.  And under Aalmuhammed and Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990),[26] Aalmuhammed owned a copyright in that scene.  Warner Brothers, the argument goes, does not own the Hajj scene, and so cannot recover for Disney's copying of that piece of Malcolm X (nor for its copying of any scene, character, or other cinematic element dreamed up by anyone not named Spike Lee).

Winning argument?

No, and it was a loser even before Garcia v. Google, 786 F.3d 733 (9th Cir. 2015) (en banc), suggested that Aalmuhammed's script of the Hajj scene was not independently copyrightable after all.[27]  See id. at 742–43.  The whole point of Aalmuhammed's contributions was to integrate them into Malcolm X, and so they must be understood as parts

---

[26]    In Effects Associates, a filmmaker hired a special effects company to produce footage of (yes) a yogurt factory exploding. Id. at 556. When the filmmaker refused to pay in full and distributed the movie (yogurt detonation and all), the company sued for copyright infringement. Id.  No one disputed that the company owned a copyright in the footage it produced, which the Ninth Circuit observed was (at least then) an obvious point. Id. at 558 ("Absent an express transfer of ownership, a contributor who is not an employee retains ownership of his copyright." (citing Dumas v. Gommerman, 865 F.2d 1093, 1101 (9th Cir. 1989)). The company's copyright claims fell flat nevertheless because, by handing over the footage to the filmmaker, the company had granted the filmmaker an implied, non-exclusive license to integrate the explosion footage into the movie. Id. at 558–59.

[27]    Garcia held that an actress did not have a copyright interest in a five-second acting performance that was incorporated into a film posted on YouTube. See id. at 740–43. The Ninth Circuit reasoned that "[t]reating every acting performance as an independent work would not only be a logistical and financial nightmare, it would turn cast of thousands into a new mantra: copyright of thousands." Id. at 743. Although the case concerned a fleeting acting performance, Garcia's holding arguably denies copyright protection to any "inseparable contribution[] integrated into a single work." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 256–59 (2d Cir. 2016) (citing Garcia and denying copyright protection to plaintiff director for his contributions to film produced by defendant, who on those facts was the movie's "author"). uCool counters that Garcia did no such thing because the Ninth Circuit observed that the plaintiff failed to "fix her work in a tangible medium." Reply at 9. But that was merely "another" barrier, on top of the "copyright of thousands" problem, so the case cannot be so readily distinguished. See Garcia, 786 F.3d at 743.

17

United States District Court
For the Northern District of California

1    of the movie to protect copyright in the movie.[28]  See id.; see also Richlin, 531 F.3d at 976

2    (holding, under the Copyright Act of 1909, that "copyright of a motion picture precludes the

3    public from copying or otherwise infringing upon the statutory rights in the motion picture,

4    including its component parts").  Copyright in movies, comic books, and video games would

5    be worthless otherwise.  Cf. Halicki Films, LLC v. Sanderson Sales & Marketing, 547 F.3d

6    1213 (9th Cir. 2008) (copyright owner of original Gone in 60 Seconds movie suing for

7    copyright infringement of Eleanor character, a car with a protectable personality);

8    DC Comics v. Towle, 802 F.3d 1012 (9th Cir. 2015) (copyright owner of Batman comic

9    books suing for copyright infringement of Batmobile character, also a car with a protectable

10   personality); Micro Star v. Formgen Inc., 154 F.3d 1107 (9th Cir. 1998) (copyright owner of

11   Duke Nukem 3D video game suing for copyright infringement of, among other things, Duke

12   Nukem character).

13        Our imagined case is this case in every way that matters, at least when it comes to

14   heroes (and other game elements) dreamed up by third parties and then given to Guinsoo or

15   Icefrog to integrate into DotA Allstars.  Valve and Blizzard are alleging infringement of their

16   games, see FAC ¶ 38, so heroes must be understood as part of those games.[29]  Nothing

17   changes for even the most hyper-detailed hero designs: Aalmuhammed's Hajj-scene

18   contribution was hyper-detailed—he wrote the script.  Aalmuhammed, 202 F.3d at 1231.

19        What is more, the owner of a copyright in a derivative work—like any version of

20   DotA or DotA Allstars—may recover from someone who copies it, notwithstanding the fact

21

22        [28]  Aalmuhammed could have sued for copyright infringement of his contributions themselves
     by alleging that Spike Lee never got permission to use them, but chose not to.  See Aalmuhammed, 202
23   F.3d at 1230.  Putting aside that damages in that case would likely have been negligible, see Effects
     Associates, 908 F.2d at 559, Aalmuhammed almost certainly granted Spike Lee an implied license to
24   integrate his contributions into Malcolm X, see id. at 558.  Purported creators of DotA heroes, like
     Terrorblaze, ShadowPenguin, or Afrothunder, would face similar obstacles—not to mention the Garcia
25   hurdle.  No wonder they haven't come roaring out of cyberspace with complaints in hand.

26        [29]  uCool counters with Self-Realization Fellowship Church v. Ananda Church of
     Self-Realization, 206 F.3d 1322 (9th Cir. 2000), which held that a publisher did not own the copyrights
27   to several photographs printed in its magazine.  Id. at 1330.  The problem for uCool is that magazines
     are textbook examples of collective works.  See 17 U.S.C. § 101 ("periodical issue").

28

United States District Court
For the Northern District of California

that it is derivative.  See Jarvis, 486 F.3d at 532 n.6.  That is true even if the derivative work's "new material is inextricably intermingled with the underlying material," id. (quoting 1 Nimmer on Copyright § 3.07[B]), though recovery extends (as always) only to the new material, 17 U.S.C. § 103(b).  Even assuming that Eul and Icefrog validly assigned their copyrights, this means that Valve may not recover for infringement of heroes and other game elements that were first integrated into a non-Eul/Icefrog version of DotA or DotA Allstars.  And it could mean that Valve may not recover for hero designs that Icefrog stumbled upon online and then integrated into DotA Allstars, provided that the designs were themselves copyrightable and posted without the aim of getting them integrated into a mod.[30]  But, crucially, it also means that Valve may recover for original expression that Eul and Icefrog contributed to their versions of DotA and DotA Allstars, as well as original expression that Valve itself contributed to Dota 2.[31]

With that, the Court turns to the validity of the assignments.

**B.      Validity of the Assignments**

Valve concedes that it must have validly acquired Eul's and Icefrog's copyrights in DotA and DotA Allstars by assignment to assert copyrights in those games.  See Opp'n at 11.  There are three possible problems with those assignments: (1) selling copyrights in mods might have violated Warcraft III's ban on using the World Editor for commercial purposes, (2) Eul might have abandoned his copyrights before assigning them to Valve, and (3) Icefrog might have assigned his copyrights to S2 before assigning them to Valve.

---

[30]  "Getting integrated" seems like the whole point of posting a hero design on a DotA web forum, so a reasonable jury could conclude that any such post included an implied non-exclusive license.

[31]  By extension, this means Blizzard may recover for original expression that Guinsoo contributed to his versions of DotA Allstars, as well as for original expression that Blizzard itself contributed to its own works from which parts of DotA derived.

19

United States District Court
For the Northern District of California

### 1.    Possibly Prohibited Commercial Use

By using Warcraft III's World Editor, Eul and Icefrog agreed not use their creations for commercial purposes.  See EULAs ¶ 3.C.iii.  Nevertheless, both men sold copyrights in their creations to Valve for a handsome price.  That use seems as commercial as uses go, which is why the Court ordered further briefing on how, if at all, Warcraft III's ban on commercial use affected uCool's motion.

uCool has now twice failed to argue that the ban prevented Eul and Icefrog from validly assigning their rights to Valve.  Instead, it has dug in on the position that "Blizzard's EULA does not and cannot impact uCool's motion."  uCool Supp. Br. at 1.  So however formidable (or feeble) a different argument would have been, uCool has waived it.[32]  See Image Tech. Serv., Inc. v. Eastman Kodak Co., 903 F.2d 612, 615 n.1 (9th Cir. 1990) (argument waived by not raising it on summary judgment).

### 2.    Eul's Alleged Abandonment

uCool argues that, by making DotA "open source," Eul abandoned any and all of his rights in DotA as a matter of law.  See MPSJ at 12–14.  And indeed, a reasonable jury could conclude that Eul's 2004 online post was an "overt act" indicating complete abandonment.  See Micro Star, 154 F.3d at 1114.  It said, "Whoever wishes to release a version of DotA may without my consent," which might mean that anyone had permission to build their own versions of DotA on any platform—and to sell their versions of Eul's creation.

Or it might not.  Eul's post also asked "for a nod in the credits to your map."  That suggests two things.  First, the request for a "nod" suggests that Eul wanted credit for creating DotA even after open-sourcing it, which cuts against abandonment.  Second, and more importantly, the reference to a "map"—a synonym for "mod"—suggests that the post was in fact a limited license.  Although Eul intended to let others build further DotA mods using the World Editor, he might not have intended to let them build stand-alone DotA

---

[32]  Although the Court has contemplated multiple summary judgment motions in this case,  Hr'g Tr. (dkt. 76) at 15:8–16:3, the time to raise this argument was now.  uCool has thus waived it for good.

United States District Court
For the Northern District of California

games for sale.[33]  See Micro Star, 154 F.3d at 1114 (holding, in a copyright case about video game mods, that "abandoning some rights is not the same as abandoning all rights").  uCool, the story goes, exceeded the scope of this license by building a smart-phone version of DotA and selling it.[34]  See S.O.S., 886 F.2d at 1087.  What is more, a reasonable jury could also conclude that the word "whoever" referred only to the motley group of modders making up an informal DotA online community.  Eul's post, in other words, was aimed only at fellow teenagers building fantasy worlds for fun—not companies exploiting them for financial gain.  So uCool was arguably no licensee at all.

The upshot: the question of copyright abandonment must go to the jury.[35]

### 3.     Icefrog's Alleged Assignment to S2

uCool also argues that S2, not Valve, owns the copyrights for three-years' worth of Icefrog's versions of DotA Allstars, and that the Court may so conclude as a matter of law.  See MPSJ at 22; Reply at 14.  Not so.  S2 owns intellectual property rights that Icefrog "created in connection" with Heroes of Newerth, not DotA Allstars.  See 2006 S2 Agreement ¶ 5; Icefrog Depo. at 125:25–129:8.  That language does not suggest that Icefrog assigned to S2 any and all intellectual property rights in DotA Allstars—quite the opposite.  And even if some creative expression created for Heroes of Newerth spilled into DotA Allstars, see

---

[33]  This holds true regardless of whether Eul used "open source" as a technical term of art or something more colloquial (which itself cannot be resolved on summary judgment).

[34]  Even if the language of Eul's 2010 assignment to Valve could somehow "memorialize[]" Eul's intent behind his 2004 post—itself a dubious proposition—it would still be far less damning evidence than uCool suggests.  See MPSJ at 13.  The assignment merely acknowledges that his subjective intent was (and remains) unclear.  See Eul Assignment at 1.

[35]  uCool's two district court cases holding that a copyright had been abandoned on summary judgment are not persuasive here.  In Hadady Corp. v. Dean Witter Reynolds, Inc., 739 F. Supp. 1392 (C.D. Cal. 1990), a distributor's newsletters included a notice saying, "The information contained in this letter is protected by U.S. copyright laws through noon EST on the 2d day after its release," which the court correctly held could indicate only an intent to abandon in whole.  Id. at 1395.  And in Wyatt Tech Corp. v. Malvern Instruments, Inc., no. 07-cv-08298 (DDP), 2009 WL 2365647 (C.D. Cal. July 29, 2009), the plaintiff never argued that he had abandoned some rights but not others, and instead relied solely on a post-hoc declaration to cobble together a dispute of material fact.  Id. at *13.  This case is not so simple.

1  Icefrog Depo. at 104:12–107:16, that would only reduce the value of Icefrog's copyrights.  It

2  would not strip him (or Valve) of ownership.

3  **IV.    CONCLUSION**

4          At bottom, uCool asks why Valve should get to capitalize on others' "free work."  The

5  answer is because Valve, if it prevails, will have proved that it acquired copyrights from

6  people who spent years creating, growing, and (yes) masterminding much of the DotA

7  universe.  Help along the way does not drain those efforts of their considerable value.  If

8  helpers feel cheated, they may come to court.  But theirs is not uCool's case to make.  For

9  that and the foregoing reasons, the Court DENIES the motion for partial summary judgment.

10  In light of that decision, the Court does not require further briefing or argument to resolve the

11  motion for Rule 11 sanctions, which is DENIED in its entirety.

12

13          **IT IS SO ORDERED.**

14          Dated: May 16, 2017

15                                                      CHARLES  R. BREYER
                                                        UNITED STATES DISTRICT JUDGE

16

United States District Court
For the Northern District of California

22