IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLIZZARD ENTERTAINMENT, INC., et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>LILITH GAMES (SHANGHAI) CO. LTD., et al.,<br><br>          Defendants. | Case No. 15-cv-04084-CRB<br><br>**ORDER**<br><br>**(1) GRANTING IN PART AND DENYING IN PART LILITH'S MOTION TO DISMISS, WITH LEAVE TO AMEND**<br><br>**(2) DENYING UCOOL DEFENDANTS' MOTION TO DISMISS** |

      Much like Plaintiffs' popular games, this copyright case has turned into quite the saga. The latest expansion pack, Plaintiffs' Second Amended Complaint ("SAC"), adds allegations against Defendant Lilith's game Soul Hunters, as well as several parties related to Defendant uCool: David Guo, Huwa IP Holdings Ltd. ("HIPH"), and Huwa, Inc. (collectively, "the uCool Defendants"). Lilith and the uCool Defendants move separately to dismiss parts of the SAC. Lilith moves to dismiss all allegations against its game Soul Hunters. See Lilith's MTD (dkt. 216). The uCool Defendants move to dismiss some of the allegations against their game Heroes Charge—namely, those relating to Diablo III, Starcraft II, and Heroes of the Storm. See uCool's MTD (dkt. 228). For the reasons discussed below, Lilith's motion is GRANTED IN PART and DENIED IN PART, with leave to amend. uCool's motion is DENIED.

# I. BACKGROUND

## A. Factual Background

According to the SAC, Plaintiff Blizzard is a game developer and copyright owner of some of the most popular computer games of the past decade, including Warcraft III and World of Warcraft ("the Warcraft games"), Starcraft II ("Starcraft"), Diablo III ("Diablo"), Hearthstone, and Heroes of the Storm. SAC (dkt. 210) ¶ 19. Blizzard—along with its co-Plaintiff Valve—also owns copyrights in hundreds of versions of the user-created "mod" to Warcraft III known as Defense of the Ancients ("DotA"). Id. ¶ 34. Additionally, Valve owns copyrights in a stand-alone game modeled on DotA called Dota 2. Id. ¶ 35.

The Warcraft games—as well as DotA and Dota 2—are strategy and role-playing games set in the same fantastical world, Azeroth, which is populated by all sorts of "unusual and distinctive" mythical creatures, including "Night Elves," "Tauren," and "Naga." Id. ¶¶ 22–25. Hearthstone, a digital playing-card game, incorporates characters and images from the Warcraft games and related products. Id. ¶ 19.

Starcraft and Diablo are different and separate franchises from the Warcraft games, taking place in their own separate universes. Starcraft is set in outer space and features a team of space soldiers called "Terran Marines." Id. ¶ 29. Diablo takes players through a ghoulish world ruled by characters such as "King Leoric, the Skeleton King." Id.

Heroes of the Storm, an online multiplayer game, brings together the best-known characters from the Warcraft games, Starcraft, and Diablo. Id. ¶ 19. Although Heroes of the Storm was officially released in final form to the public in June 2015, the game was first made available to the public over a year earlier, in March 2014. Id.; see also FAC (dkt. 36) ¶ 11.

Defendant Lilith develops mobile games and is the developer, owner, and distributor of the games Dota Legends and Dot Arena (both names are allegedly references to DotA and Dota 2). SAC ¶¶ 40–41. Dota Legends and Dot Arena are "substantively identical." Id. ¶ 42. Lilith is also the creator and distributor of Soul Hunters, a "reskin" or "reimplementation" of Dota Legends. Id. ¶ 43. In other words, Soul Hunters is "the same

basic game" as Dota Legends but with "some changes to some of the game's artwork" and "some additional, new, or different" hero characters. Id.

The uCool Defendants include several entities—uCool, Huwa, and HIPH—as well as individual David Guo. Id. ¶¶ 12–16. Together, the uCool Defendants developed, marketed, and distributed the mobile game Heroes Charge, with David Guo personally directing and supervising these activities. Id. ¶¶ 46–47. Heroes Charge was the subject of a separate copyright suit between Lilith and uCool, in which Judge Samuel Conti noted "striking similarities between . . . protected elements" of Dota Legends and Heroes Charge. Lilith Games (Shanghai) Co. v. uCool, Inc., No. 15-1267, 2015 WL 5591612, at *9 (N.D. Cal. Sep. 23, 2015); see also SAC ¶ 45.

### B. Procedural Background

Two-and-a-half years after the commencement of this case, we are back where we started (perhaps a little wiser but certainly no younger). Along the way, several notable things have happened.

In December 2015, Plaintiffs' original complaint was dismissed, with leave to amend, because Plaintiffs (1) failed to plausibly plead any copyrightable subject matter and (2) made only general allegations of infringement without providing specific, representative acts of infringement. See First Dismissal Order (dkt. 35) at 9–10. Plaintiffs subsequently filed a First Amended Complaint ("FAC"), which not only pled that constituent elements of Plaintiffs' works, including certain characters, were copyrightable, but also included a set of exhibits with specific, representative examples of alleged infringements. See FAC ¶¶ 14–29, 42–54, Exs. A–D. uCool moved to dismiss the FAC, but at a hearing on April 8, 2016, the Court denied uCool's motion, noting that the FAC appeared to have "successfully address[ed]" the shortcomings of the original complaint. Trans. of 4/8/16 Hear'g (dkt. 76) at 2. uCool then moved for partial summary judgment on the issue of Valve's ownership of copyrights in DotA, which was denied. See PSJ Order (dkt. 162).

Plaintiffs have now filed a Second Amended Complaint, which differs from their FAC in two material respects.  First, Plaintiffs have significantly expanded their references to Lilith's game Soul Hunters and made clear that their allegations of infringement include Soul Hunters.  Compare SAC ¶¶ 39–43 with FAC ¶¶ 31–32.  Second, Plaintiffs have added other uCool defendants—Huwa, HIPH, and David Guo—whose involvement in the alleged infringement was uncovered during discovery.  Compare SAC ¶¶ 45–49, 80–111 with FAC ¶¶ 34–35, 66–74.  Aside from these two differences, the SAC, like the FAC, alleges that Defendants used in their games specific elements derived from—and substantially similar to—elements contained in Plaintiffs' games, including (1) visual depictions of, and skills given to, individual characters, (2) in-game icon artwork, (3) visual depictions of locations and landmarks, (4) musical compositions, and (5) the overall look and feel.  Compare SAC ¶¶ 50–68 with FAC ¶¶ 36–54.  The SAC also includes exhibits with representative examples of alleged infringements, very similar to the exhibits attached to the FAC.  Compare SAC Exs. A–D with FAC Exs. A–D.

Both Lilith and the uCool Defendants move to dismiss parts of the SAC, arguing primarily that Plaintiffs have not plausibly alleged that Defendants copied and infringed Plaintiffs' games.  See Lilith's MTD; uCool's MTD.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Accordingly, pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action if the complaint fails to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This means that, though a complaint need not contain "detailed factual allegations," it must provide more than "a formulaic recitation of the elements of a cause of action," so as to give the defendant "fair

notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555; see also Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008).

### B.     Copyright Infringement

To state a claim of copyright infringement, a plaintiff must allege (1) ownership of a valid copyright, and (2) illicit copying of constituent elements of the work that are original. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Here, Defendants' motions largely focus on the second prong. This second prong itself requires showing two things: (1) that portions of the plaintiff's work were in fact copied and (2) that the copying amounts to infringement, that is, "unlawful appropriation." Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946); see also Rentmeester v. Nike, Inc., — F.3d —, 2018 WL 1055846, at *3 (9th Cir. Feb. 27, 2018). Absent direct evidence of copying, factual copying may be established circumstantially by showing that the infringer had access to the plaintiff's copyrighted work and that there exist similarities between the two works that are "probative of copying." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003); Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139–40 (2d Cir. 1992); see also Rentmeester, 2018 WL 1055846, at *3. Once factual copying has been established, infringement is determined by comparing the works for "substantial similarity" of protected elements. Laureyssens, 964 F.2d at 139–40; see also Rentmeester, 2018 WL 1055846, at *3.

Substantial similarity entails a two-part analysis consisting of an "intrinsic" test and an "extrinsic" test. Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994). The "intrinsic" test asks "'whether the ordinary, reasonable audience' would

5

find the works substantially similar in the 'total concept and feel of the works'"—a question that must be left to the finder of fact. Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002) (quoting Kouf, 16 F.3d at 1045); see also Swirsky v. Carey, 376 F.3d 841, 845 (9th Cir. 2004). The "extrinsic" test, meanwhile, is "an objective comparison of specific expressive elements." Cavalier, 297 F.3d at 822. This involves breaking works down into their constituent elements, distinguishing between protected and unprotected material, and comparing protected elements for proof of copying as measured by "substantial similarity." See Swirsky, 376 F.3d at 845; see also Apple Comput., Inc. v. Microsoft Corp., 35 F.3d 1435, 1443 (9th Cir. 1994).

"[W]hen the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss" on the ground that the works are not substantially similar. Christianson v. West Pub. Co., 149 F.2d 202, 203 (9th Cir. 1945). Here, however, Plaintiffs have offered only representative examples of the ways in which Defendants' games are similar to their own, not entire works capable of examination and comparison. Accordingly, the question before the Court is whether Plaintiffs have plausibly alleged substantial similarity and put Defendants on fair notice of their claims. See Baca, 652 F.3d at 1216.

### III. DISCUSSION

#### A. Lilith's Motion to Dismiss

Lilith moves to dismiss the allegations against its game Soul Hunters on the grounds that Plaintiffs have neither (1) specifically identified the infringed works nor (2) plausibly alleged substantial similarity between each of their games and Soul Hunters, and have therefore failed to state a claim of copyright infringement with respect to Soul Hunters.

On the issue of identifying the allegedly infringed works, Lilith's argument fails. Lilith argues that Plaintiffs have not specifically identified which works Soul Hunters infringes, alleging only generally that Soul Hunters infringes "the Blizzard Works" and

6

"DotA." See Lilith's MTD at 6–7, 10–11. Lilith's co-defendant, however, previously made a similar argument, contending that there was "no way . . . to determine from the face of the Complaint what works are at issue." Dkt. 20 at 8. This argument was rejected because Plaintiffs' original complaint adequately "identified numerous allegedly infringed copyrights and their respective owners." See First Dismissal Order at 6. Plaintiffs' SAC is no less clear in identifying what works are at issue. See SAC ¶¶ 19–21, 30–35, Schedule A.

Identifying the works at issue, though, is only the first step. To survive dismissal of their claims, Plaintiffs must allege facts that plausibly show infringement of their works. The meat of Lilith's motion argues that Plaintiffs fail to meet this standard. In particular, Lilith argues that Plaintiffs do not sufficiently allege which elements of their games are copyrightable, and which expression(s) from Soul Hunters are substantially similar to any protectable elements. See Lilith's MTD at 7–10, 11–14. Although Lilith's argument is largely unpersuasive, there is merit to its arguments regarding Starcraft and Diablo.

The Ninth Circuit's "extrinsic" test for substantial similarity involves three steps: identifying the sources of alleged similarity, distinguishing between protected and unprotected material, and comparing protected elements for substantial similarity. See Swirsky, 376 F.3d at 845; Apple, 35 F.3d at 1443. Here, Plaintiffs' SAC clearly identifies the sources of alleged similarity, including (1) visual depictions of individual characters, as well as skills and abilities given to them, (2) in-game icon artwork, (3) visual depictions of locations and landmarks, (4) musical compositions, and (5) the overall look and feel. SAC ¶ 52.

Plaintiffs' SAC also sufficiently alleges that the sources of alleged similarity represent copyrightable subject matter. This step is important because not all elements of a copyrighted work are protectable. Unprotected elements include ideas, expressions that are indistinguishable from the underlying ideas (merger doctrine), standard or stock elements (scènes à faire), and facts. See Apple, 35 F.3d at 1444; see also Gorski, 2014 WL 3533324, at *4. In particular, a character is protectable only if it (1) generally has

7

"physical as well as conceptual qualities," (2) is "sufficiently delineated to be recognizable as the same character whenever it appears," and (3) is "especially distinctive and contain[s] some unique elements of expression." DC Comics v. Towle, 802 F.3d 1012, 1021 (9th Cir. 2015) (citations and internal quotation marks omitted).  Plaintiffs' SAC provides several representative examples of plausibly copyrightable characters, depictions of landmarks, in-game artwork, and musical compositions.  See SAC ¶¶ 23–28, 29, 36, 63–67.  For example, the SAC alleges that "Illidan Stormrage" is a "Night-Elf-turned-demon" who is "usually depicted as a muscular purple-skinned night elf with long black hair and intricate tattoos (arcane and tribal in appearance) adorning his torso and arms." SAC ¶ 25(b).  He "wields two long, distinct, bladed weapons," and when in his "demon form," has "two long, curved horns growing from his head, and two long, frayed, bat-like wings." Id.  Similarly, the SAC describes the "Dark Portal," a magical gate in World of Warcraft that features "a dragon head and claws" and "transports characters to the world of 'Outland.'" SAC ¶ 26.  These types of representative examples are enough at the pleading stage.  See Perfect 10, Inc. v. Cybernet Ventures, Inc., 167 F. Supp. 2d 1114, 1120 (C.D. Cal. 2001) ("Copyright claims need not be pled with particularity."); cf. First Dismissal Order at 9–10 (holding that a complaint need only allege representative acts of infringement, and dismissing Plaintiffs' claims for failure to provide such examples).

Finally, the SAC compares the alleged protected elements in Plaintiffs' games to elements of Soul Hunters.  See SAC Exs. A–B.  For example, the SAC compares a depiction of "Illidan Stormrage" in World of Warcraft to a Facebook ad for Soul Hunters.  See SAC Ex. A at 7.  The ad shows a character that—like Illidan—carries two long, bladed weapons and has two curved horns growing from its head:




"Illidan Stormrage" from World of Warcraft     Facebook ad for Soul Hunters

Lilith argues that these "comparison[s] of bare images" are not enough because they fail to detail the protected elements of each character and compare them specifically to those in Soul Hunters. See Lilith's MTD at 9–14; Lilith's Reply (dkt. 237) at 8–9. But Lilith's proposed standard is not the pleading standard. Rule 8 requires not "detailed factual allegations" but rather only enough factual matter to show that a claim is "plausible on its face" and to give the defendant "fair notice." Twombly, 550 U.S. at 555, 570. Here, with respect to most of Plaintiffs' games, Lilith cannot reasonably argue that the SAC and its exhibits fail to provide fair notice or enough factual matter showing that Plaintiffs' claims are plausible on their face. In particular, the SAC and its exhibits allege several representative examples of Soul Hunters infringing the Warcraft games, DotA, and Dota 2. See SAC Exs. A and B. And though Lilith suggests that Plaintiffs provide no specific allegations of Soul Hunters infringing Hearthstone and Heroes of the Storm, see Lilith's MTD at 8, Plaintiffs in fact do provide representative examples of infringement with respect to both games. See SAC Ex. A at 4 and 9.

Moreover, to the extent that there are different versions of these games—that is, different versions of the Warcraft games, DotA, Dota 2, Hearthstone, and Heroes of the Storm—Plaintiffs need not provide examples of infringement with respect to each version. Although each version of Plaintiffs' games constitutes a separate work, see 17 U.S.C. § 101, here Plaintiffs have sufficiently alleged that the copyrightable elements in their games are consistent across different versions. See, e.g., SAC ¶ 22 ("The creatures that

9

inhabit the Warcraft universe are depicted visually within the games and <u>appear consistently throughout</u> the Warcraft games."). Therefore, in this case, what particular version any alleged representative example of infringement comes from is not especially relevant: to the extent that Plaintiffs have sufficiently alleged infringement with respect to one version of one of their games, they have sufficiently alleged infringement with respect to every version of that game. See <u>id.</u> at 1023–24. Because Plaintiffs sufficiently allege representative examples with respect to at least one version of the Warcraft games, DotA, Dota 2, Hearthstone, and Heroes of the Storm, they state a plausible claim of infringement against Soul Hunters with respect to these games.

With respect to Diablo and Starcraft, however, Lilith's argument has more merit. Lilith argues that Plaintiffs do not plausibly allege substantial similarity between Soul Hunters and Diablo and Starcraft. <u>See</u> Lilith's MTD at 7–8. Lilith is right: although the SAC plausibly alleges copyrightable elements in both Starcraft and Diablo, it contains no specific examples (representative or otherwise) of Soul Hunters allegedly infringing these copyrightable elements. <u>See</u> SAC ¶¶ 29, 59. The SAC indicates that Diablo and Starcraft are entirely different franchises from the Warcraft games; they are set in different universes and have different characters. <u>Id.</u> ¶ 29. Nothing in the SAC suggests that any of the representative examples of Soul Hunters infringing Plaintiffs' other games (Warcraft, DotA, Dota 2, Hearthstone, Heroes of the Storm) extend to Diablo or Starcraft.

The SAC <u>does</u> specifically allege that characters from Dot Arena (another Lilith game) infringe Diablo and Starcraft. <u>See id.</u> ¶ 59. But the SAC also notes that Dot Arena and Soul Hunters have different artwork and characters. <u>See id.</u> ¶ 43. Accordingly, plausible allegations against Dot Arena do not equate to plausible allegations against Soul Hunters.

Thus, the SAC fails to state a plausible claim that Soul Hunters infringes Diablo and Starcraft, and Lilith's motion is GRANTED with respect to these two games. To be clear, only the Diablo and Starcraft claims <u>against Soul Hunters</u> are dismissed; those against Lilith's other games are not.

### B. uCool's Motion to Dismiss

The uCool Defendants move to dismiss claims against Heroes Charge relating to Starcraft, Diablo, and Heroes of the Storm. They argue that (1) "aggregating" Plaintiffs' games is not a legally cognizable theory, (2) Heroes Charge is not substantially similar to Diablo or Starcraft, and (3) Plaintiffs cannot plead access to Heroes of the Storm because Blizzard released it to the public <u>after</u> Heroes Charge was released. These arguments fail.

#### 1. "Aggregation" Theory

The uCool Defendants argue first that Plaintiffs are not allowed to "mix-and-match elements from multiple works to manufacture substantial similarity." uCool's MTD at 7. This argument mischaracterizes Plaintiffs' allegations. Plaintiffs allege that the uCool Defendants infringed several of Plaintiffs' games—including Warcraft, Starcraft, and Diablo—by copying protected elements in each of those games. <u>See</u> SAC ¶¶ 1, 52, 59. Plaintiffs are not relying on an "aggregation" theory. <u>See id.</u>; <u>see also</u> Opp. (dkt. 235) at 9–10.

#### 2. Infringement of Diablo and Starcraft

Plaintiffs clearly and specifically allege that the depictions of "War Chief" and "Rifleman" in Heroes Charge are substantially similar to (and thus infringe) protected expression in Diablo and Starcraft—namely, "King Leoric" from Diablo and "Terran Marine" from Starcraft, respectively. <u>See</u> SAC ¶ 59.

The uCool Defendants, however, note that "War Chief" and "Rifleman" are merely two characters out of 135 characters in Heroes Charge, and therefore, there is no substantial similarity. <u>See</u> uCool's MTD at 10, 14. It appears that the uCool Defendants are arguing that their alleged copying is <u>de minimis</u>—that is, the alleged copying is so trivial that it does not rise to the level of substantial similarity. <u>See</u> <u>Newton v. Diamond</u>, 388 F.3d 1189, 1192–93 (9th Cir. 2004); <u>Ringgold v. Black Entm't Television, Inc.</u>, 126 F.3d 70, 74–75 (2d Cir. 1997). But the uCool Defendants get the rule backwards. The relevant inquiry is not whether a substantial portion of the <u>defendant's</u> work was derived from the plaintiff's work but whether protectable material in the plaintiff's work was

11

substantially appropriated.  See Worth v. Selchow & Righter Co., 827 F.2d 569, 570 n.1 (9th Cir. 1987).  "A taking may not be excused merely because it is insubstantial with respect to the infringing work."  Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 565 (1985) (emphasis in original).  Thus, that the uCool Defendants may not have appropriated 133 other characters from one of Plaintiffs' games does not mean Plaintiffs have failed to plausibly allege that the uCool Defendants copied protectable expression in Diablo and Starcraft.  Moreover, because Plaintiffs are not required to plead every instance of infringement, their claims are not necessarily limited to "War Chief" and "Rifleman."  Cf. Perfect 10, 167 F. Supp. 2d at 1120 ("Requiring a statement of each and every example would defeat the regime established by Rule 8.").

The uCool Defendants also contend that "King Leoric" and "Terran Marine" are "generic" and therefore not copyrightable.  uCool's MTD at 12.  The uCool Defendants may be correct that "skeleton kings" and "space soldiers"—stock characters in the video game context—constitute unprotected expression under the scènes à faire doctrine.  See Capcom, 2008 WL 4661479, at *6.  But Plaintiffs allege a variety of features that are not "generic" in the video game context.  For example, the SAC describes King Leoric as having "long white hair and beard, distinctive armor, a red loincloth and a spiky gold crown."  SAC ¶ 29.  Additionally, the SAC describes Terran Marine as wearing "a distinctive set of giant blue space armor with huge, oversized shoulder pads, a fully-enclosed helmet with round tubes protruding from it, and a yellow faceplate."  Id.  It also emphasizes Terran Marine's "comically oversized rifles that are often at least one-half the size of the entire suit of armor."  Id.  Finally, the SAC provides visual depictions of both King Leoric and Terran Marine, which highlight Plaintiffs' particular expression of the idea of "skeleton kings" and "space soldiers."  Id.



"Leoric" from Diablo III and Heroes of the Storm                   "Terran Marine" from Starcraft II

Plaintiffs plausibly allege protectable expression in Diablo and Starcraft that "War Chief" and "Rifleman" infringe.

### 3. Access to Heroes of the Storm

The uCool Defendants contend that it is not plausible that they had access to Heroes of the Storm because Heroes of the Storm was not "published" until June 2015, and Heroes Charge was released in August 2014. See uCool's MTD at 15; see also SAC ¶ 45. The uCool Defendants attach multiple exhibits to their reply showing that Heroes of the Storm was "published" in June 2015, including a copy of Blizzard's registration with the Copyright Office and complaints in other court proceedings. See Reply (dkt. 240) at 13–15 and exhibits. Plaintiffs allege that Heroes of the Storm "first was released to the public in March 2014." SAC ¶ 19; see also FAC ¶ 11.

When ruling on a motion to dismiss, a court may take judicial notice of registrations with the Copyright Office as well as court documents already in the public record. See Holder v. Holder, 305 F.3d 854, 866 (9th Cir. 2002); Vigil v. Walt Disney Co., 1995 WL 621832, at *1–2 (N.D. Cal. Oct. 16, 1995). Whether the June 2015 publication date is true or not, however, is not determinative at this stage. First, proof of access is not necessary to show copying. See Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000) ("in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that [the works are] 'strikingly similar'"). Moreover, that Heroes of the Storm was "published" in June 2015 does not, as a practical matter, necessarily contradict Plaintiffs' claim that the game was "first . . . released to the public" in March

2014. For example, certain members of the public may have been allowed to test the game before it was "published" and widely released in June 2015. In fact, in their FAC, Plaintiffs alleged:

> Beginning in March 2014, Blizzard released to members of the public the game "Heroes of the Storm," an online multiplayer game that brings together Blizzard's best-known characters from each of its major game franchises. Heroes of the Storm was released to the public in final form in June 2015 and was highly publicized for years before its release.

FAC ¶ 11. Because the pleadings at this stage are construed in the light most favorable to the Plaintiffs, uCool's argument fails. Finally, Plaintiffs' SAC provides a number of specific, representative examples of alleged infringement between Heroes Charge and Heroes of the Storm. See, e.g., SAC Ex. A at 1–2, 4, 16. Plaintiffs therefore have stated a plausible claim of copyright infringement. Cf. First Dismissal Order at 10 (holding that "a plausible claim would require that Plaintiffs submit a representative sampling of infringed content"). uCool's motion is accordingly DENIED.

## IV.     CONCLUSION

For the foregoing reasons, Lilith's motion to dismiss is GRANTED IN PART and DENIED IN PART. Lilith's motion is granted only with respect to allegations that Soul Hunters infringes Diablo and Starcraft. With respect to all other allegations against Soul Hunters, Lilith's motion is denied without prejudice. uCool's motion is DENIED without prejudice.

Plaintiffs are given leave to amend their Diablo and Starcraft allegations. Any amended complaint shall be filed by March 29, 2018. Extensions of time in which to file motions to dismiss will not be granted except on a particularized showing of good cause.

**IT IS SO ORDERED.**

Dated: March 8, 2018

CHARLES R. BREYER
United States District Judge